Pek Cueiam :
This contract case was referred under former Buie 45(a) (now Buie 57(a)) to Trial Commissioner Mastín G. White with directions to make findings of fact and a recommendation for a conclusion of law. The Commissioner has done so in an opinion and findings filed on January 16, 1964, which deal with one of the claims but not with the entire case. Plaintiffs except to part of the Commissioner’s report (relating to his determination of damages) and the defendant rejects the whole report. The parties have filed briefs, and oral argument has been had. We discuss the issue of the Government’s liability in Part I and deal with the question of the amount of damages in Part II. Part III incorporates the Commissioner’s opinion, with minor changes made by the court.
I.
The judicial trial on the claim now before the court was held shortly after the decision of the Supreme Court in United States v. Carlo Bianchi & Co., 373 U.S. 709 (June 3, 1963). On the issue of the Government’s liability, the plaintiffs, at the trial, did not offer any de novo evidence but contented themselves with those items of evidence in the record before the Armed Services Board of Contract Appeals which, in plaintiffs’ view, supported their claim. The defendant objected to this method of proceeding and insisted that plaintiffs must introduce the entire administrative record (which was extremely bulky and disorganized). When the Commis *232 sioner would not require plaintiffs to do this, defendant refused to offer any part of the administrative record and rested without submitting any additional portions of that record. The central issue is whether the Commissioner correctly decided the issue of liability on the basis of those parts of the administrative record which the plaintiffs proffered at the trial- — the defendant having repeatedly refused to introduce any part of the administrative record, despite the Commissioner’s repeated statements that he would accept and consider any part of that record the defendant wished to proffer.
Most of the history and background of this controversy is set forth in the portion of the Commissioner’s opinion which treats with liability. The court agrees with that portion of his opinion (as modified by the court) and adopts it, as supplemented by this Part I, as its basis for judgment on the issue of liability (together with the Commissioner’s findings bearing on that issue).
The short of the matter is that at the trial, after the plaintiffs introduced the parts of the administrative record on which they relied, the Commissioner gave the defendant every opportunity to introduce any other parts of that record which defendant believed pertinent to a review of the administrative determination; the defendant resolutely refused to do so and left the Commissioner to proceed (on the issue of liability) solely on the selections from the administrative record made by plaintiffs; in those circumstances, the Commissioner properly went ahead on the basis of plaintiffs’ references;[1] and on that basis he was correct in concluding that the Board’s factual determination (that no loss had occurred) was unsupported by substantial evidence in the record before it.[2]
We add the following details in order to round out the history of this issue (in this case) and to discuss certain points raised by the defendant’s argument. On January 17, *233 1963 — before trial but after some pre-trial proceedings— the plcdntiffs moved for summary judgment on this claim, on the basis of the administrative record; defendant opposed on the ground, among others, that there was as yet no record and no evidence on which to enter judgment and that there was a genuine issue of material fact on the question of the loss for which the Government could be held liable; the court denied the plaintiffs’ motion, by order, and without hearing oral argument, on March 22, 1963. The trial was set for July 15, 1963, in Texas. On June 10, 1963, the defendant’s counsel wrote plaintiffs’ counsel that, though the Government was not prepared at that time to stipulate that the administrative record or any part thereof could be offered at the trial, “we will not oppose the offer by you of any part of the administrative record during the presentation of your case” and that “in the event you do not offer the entire administrative record in this case * * * we have reserved the right to do so.” In a letter of June 17, 1963, plaintiffs’ counsel agreed to this procedure. See finding 20. In short, up to the closing days of June 1963, the defendant clearly contemplated a trial and also envisaged that the whole or part of the administrative record could be introduced at that trial.
On June 26, 1963, less than three weeks before trial, defendant moved for leave to file a motion for summary judgment (attaching the latter motion) on the ground that the administrative record showed that plaintiffs could not recover on this claim and that BianoM precluded any de novo evidence. The court (Whitaker J. dissenting) denied the motion for leave to file, by order and without oral argument, on June 28, 1963; but the denial was expressly stated to be without prejudice. A motion to reconsider this order was denied by the court, again without prejudice, on July ‘5, 1963. Also on June 26, 1963, defendant moved to remove the case from the trial calendar and to limit further proceedings to review of the administrative record; this action was denied by Commissioner White on June 28, 1963, in an order which stated that “the denial of the motion shall not preclude the defendant from contending at the trial that *234 additional evidence relating to disputed questions of fact which have been decided by the administrative agency cannot properly be admitted.” Defendant’s request to the court to review this order of the Commissioner was denied, without prejudice, on July 5,1963.
The trial was held, as scheduled, on July 15, 1963. In ruling on defendant’s renewed motion to limit further proceedings to the administrative record and to bar de novo evidence, the Commissioner made it absolutely plain (Tr. 38-43) that he did not intend, on any issue of fact decided by the Board of Contract Appeals, to accept or consider de novo evidence, but that, in view of the bulk and nature of the administrative record, he did desire the help of both parties, through presentation of the parts of that record each deemed pertinent, on the relevant issues of fact determined by the Board, as well as the relevant testimony and documentary evidence on which the Board decided those issues. Wrongly characterizing this receipt of parts of the administrative record, in the manner desired by the Commissioner, as the prohibited receipt of de novo evidence, the defendant refused to offer any part of that record. Several times throughout the short trial, the Commissioner indicated to defendant that it could offer, and he would accept, such other portions of the record as it wished (Tr. 63, 63-4, 64, 65, 68, 69, 70), but the defendant continued to refuse.
In this state of the judicial record, we cannot accept defendant’s suggestion that it acted as it did, at the trial, because it was led to believe that the Commissioner and the court deemed the Bianchi ruling not to be controlling and, on the issue of liability, would consider evidence outside that contained in the administrative record. The court’s refusal to entertain the Government’s motion for summary judgment, belatedly made on the eve of the trial, cannot have been taken as a ruling to that effect since the. motion was explicitly denied “without prejudice.” The matter was obviously left for disposition at a later stage of the litigation. The Commissioner’s refusal to remove the case from the trial calendar stated specifically that the defendant could continue to contend at the trial that outside evidence should *235 not be admitted; and the court’s declination to review that order was again “without prejudice.” At the trial, itself the Commissioner gave defendant no reason to believe that he would accept such outside evidence on the issue of liability, and everything the plaintiffs offered came from the administrative record.[3] Neither the court nor the Commissioner can be charged with inducing the self-defeating stand defendant took.
Nor can we agree that a Commissioner is disabled from obtaining the parties’ aid as to the relevant parts of the administrative record by asking them each to proffer the particular portions on which it relies. This is an acceptable method of proceeding, especially with an administrative record which is as large, cumbersome, and complex as this one — and which largely concerns claims not now before the court. The point is that the parties have an obligation to help the Commissioner in his consideration of the administrative record, and they cannot dictate his procedure so long as their rights are not prejudiced. There was not an iota of prejudice to defendant in the method Commissioner White followed here. It makes no discernible practical or substantive difference whether the administrative record is first submitted or offered as a whole and the parties then point out the portions on which they rely, or whether the step-by-step procedure used here is adopted. Similarly, we know of no good reason for a rigid requirement that the party attacking a board decision must be the one to present it to the court, or any valid reason why that function cannot be divided. There is likewise no significant difference whether the administrative record (in whole or in part) is technically offered into evidence or whether it is simply submitted for the court’s review. These are all, normally, im *236 material procedural choices which lie within the court’s discretion and on which no litigant can rightly insist unless he can somehow show real prejudice or real need.
II.
Plaintiffs challenge the Commissioner’s conclusion that the damages (on the single claim we are now considering) were only $18,188.82. We have reviewed plaintiffs’ three exceptions and reject them for the reasons given below.[4] Accordingly, the court adopts the portion of the Commissioner’s opinion dealing with damages as well as his findings on that subject — as supplemented by this Part II — as a basis for judgment.
As the Commissioner points out, under Stein Bros. Mfg. Co. v. United States, 162 Ct. Cl. 802, 808-09, 337 F. 2d 861, 863-64 (1963), and WPC Enterprises, Inc. v. United States, 163 Ct. Cl. 1, 12, 323 F. 2d 874, 880 (1963), the court can determine the recovery even though the dispute is deemed to come under the Changes article, since the Board did not reach that issue. The evidentiary basis in this case for the court’s award consists of the parts of the administrative record offered by the plaintiffs at the trial, plus facts agreed to, explicitly or implicitly, by the parties at pre-trial (and incorporated in memoranda admitted into evidence by the Commissioner as his exhibits). For the reasons given in Part I, supra, the defendant cannot object to consideration of the portions of the administrative record received in evidence. As for the facts agreed to at pre-trial, without objection, they are also properly to be considered. General Bronze Corp. v. United States, 168 Ct. Cl. 176, 178-79, 338 F. 2d 117 (1964); Stein Bros. Mfg. Co. v. United States, supra, and similar rulings. More particularly, the Stein Bros, line of decisions precludes the defendant from now objecting to the use of its own pre-trial memoranda and figures since it proffered them itself, without reservation (prior to the Bianchi decision). The Commissioner’s calculations are all *237 based upon figures shown by the administrative record or upon which the parties. agreed — though the parties may have disputed the significance or usability of some of those figures. See footnote 3, supra.
The first of plaintiffs’ exceptions is that the electrical work was delayed ('by the defendant’s directive to construct the floors first) some 7 or 714 months, rather than the 4% months found by the Commissioner (finding 18). The time for performance of the prime contract was extended to May 1, 1955, under certain change orders issued by the defendant (including some new electrical work). The Commissioner has measured the compensable delay time from that date. Plaintiffs claim that on the electrical work the compensable delay began well before May 1st. We are unable to say, however, that plaintiffs have borne their double burden (Commerce Int'l Co. v. United States, 167 Ct. Cl. 529, 536-37, 338 F. 2d 81 (1964)) of proving with sufficient particularity that the electrical subcontractor was not kept reasonably occupied until about May 1st (including work under the new change orders and other work unaffected by the “floors first” directive), or that it would not have been delayed in any event by the change orders unconnected with the directive challenged in this case, or that it was not adequately compensated for this period by the other change orders.
The second exception is that the Commissioner measured the contractor’s delay costs with respect to equipment and tools by the standard of depreciation rather than of fair rental value. In certain other cases we have allowed half of the fair rental value, properly determined, but in this case depreciation is the preferable measure. The only rental rate offered by plaintiffs was the commercial one accepted by the equipment dealers association, but the electrical subcontractor here was not such a dealer nor does the record show that it rented out its equipment; in addition, the plaintiffs’ total figure from the rental value of the equipment during the claimed delay was more than the value of that equipment as it appeared on the subcontractor’s own books. In the absence of proof of a fair rental value which is appropriate for the *238 particular contractor, depreciation should be used.[5] In any event, plaintiffs’ total rental figures cannot be used because they are based on a much longer delay than we find attributable to the defendant.
The third exception is that the Commissioner erred in finding that the cost of supervision amounted to $6,319.31, instead of the $14,050.35 claimed by plaintiffs. Again, plaintiffs’ figure is based on a much longer delay period than the Commissioner or the court has allowed. For the delay period we find, the Commissioner’s figure is correct.
In sum, plaintiffs are entitled to a judgment of $18,188.82, for the use and benefit of A. & H., Inc., as recommended by the Commissioner, and judgment is entered to that effect.
III.
Commissioner White’s opinion, with minor modifications by the court, is as follows:

Introduction

This case grew out of a contract for the construction of buildings at the Longhorn Ordnance Works, located in Harrison County, Texas. A joint venture, consisting of two Texas corporations, H. K. Henderson & Company[6] and A. & H., Inc., was the prime contractor. A. & H., Inc., in addition to being part of the joint venture, was also the electrical subcontractor under the prime contract.
In the present action, the two corporations comprising the joint venture assert a claim on behalf of the joint venture, and they assert a separate claim in behalf of A. & H., Inc., as the electrical subcontractor. (For the sake of conven *239 ience, the term “prime contractor” will ordinarily be used hereafter in the opinion to denote the two corporations collectively as members of the joint venture.)
Since the defendant has conceded liability with respect to the prime contractor’s main claim (although there is a dispute concerning the amount for which the defendant is liable), but has denied liability relative to the claim that is asserted in behalf of the electrical subcontractor, the initial submission to the court is limited to the claim of A. & H., Inc., as the electrical subcontractor.

Nature of Litigation

The pleadings filed by the plaintiffs allege that the contract was breached by the defendant and that the plaintiffs sustained damages as a result of the breach. The first problem to be considered is whether the facts underlying the alleged breach of contract are within or outside the scope of the “Disputes” provision of the contract and the related provision contained in the first section of the so-called Wunderlich Act (41 U.S.C. § 321 (1958)), as interpreted by the Supreme Court in the case of United States v. Carlo Bianchi, Inc., 373 U.S. 709 (1963).
The first section of the Wunderlich Act provides, in effect, that an administrative determination on a question of fact made under the standard “Disputes” provision of a Government contract shall be final and conclusive unless the determination is fraudulent, capricious, arbitrary, or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence. In its Bianchi decision, the Supreme Court held that (in the absence of allegations of fraud) the “determination of the finality to' be attached to a departmental decision on a question arising under a ‘disputes’ clause must rest solely on consideration of the record before the department” (373 U.S. at p. 714).
The buildings to be erected under the contract were to contain concrete floor slabs, with accompanying walls and roofs. Fairly soon after work was begun under the contract, a dispute arose between the prime contractor and personnel of the defendant with respect to whether, in connection with *240 the erection of the buildings, the contract should be interpreted as providing that the roofs and walls would be constructed before the concrete floor slabs were placed, or as providing that the concrete floor slabs would be placed first. This dispute grew out of a discrepancy between the drawings and the specifications that were attached to and formed part of the contract. The prime contractor argued that the first of the two interpretations previously mentioned was the correct one. The dispute was finally resolved by a representative of the contracting officer in favor of the “roofs and walls first” plan of construction for which the prime contractor contended. The administrative decision was incorporated in a letter dated August 5, 1954, to the prime contractor, stating in part as follows:
This is to confirm telephonic information given Mr. John Henry of your organization, 2 August 1954, at which time Mr. Henry was informed by the writer that the placement of structural floor slabs after roofs had been constructed and in accordance with your proposed method of construction was approved * * *.
The action of the contracting officer’s representative referred to in the preceding paragraph fixed the official interpretation of the contract as providing for the “roofs and walls first” plan of construction, since the contract contained a general provision, numbered 2, stating in part as follows:
* * * In any case of discrepancy either in the figures, in the drawings, or in the specifications, the matter shall be promptly submitted to the Contracting Officer, who shall promptly make a determination in writing. Any adjustment by the Contractor without this determination shall be at his own risk and expense. * * *
About 3 weeks after it was officially agreed that the contract should be interpreted as providing for the “roofs and walls first” plan of construction, a representative of the contracting officer on August 24,1954, issued an oral directive to the prime contractor, requiring that the sequence of construction provided for in the contract be reversed and that the prime contractor adopt a plan of construction whereby the concrete floor slabs would be placed prior to the construction of the walls and roofs of the buildings. As hereafter in *241 dicated, the court need not decide whether this directive was a change under the contract or whether the interference by the contracting officer’s representative with the performance of the contract in accordance with its provisions, disadvantageous to the prime contractor, constituted a breach of the contract (see George A. Fuller Company v. United States, 108 Ct. Cl. 70, 94-95 (1947), 69 F. Supp. 409, 411-412; F. H. McGraw and Company v. United States, 131 Ct. Cl. 501, 507 (1955), 130 F. Supp. 394, 397; Volentine and Littleton v. United States, 144 Ct. Cl. 723, 726 (1959), 169 F. Supp. 263, 265). If it was a breach, the prime contractor thereupon had the option of abandoning performance under the contract and suing for any damages that had been sustained as of the time of the breach (Anvil Mining Company v. Humble, 153 U.S. 540, 552 (1894)), or of proceeding with the erection of the buildings despite the interference and then, after the completion of the job, instituting an action for the damages sustained as a result of the breach of contract (United States v. Smith, 94 U.S. 214, 217-218 (1876)).
After receiving from the contracting officer’s representative the directive previously referred to, the prime contractor, under protest but with vigor, launched into and carried out a “floors first” method of construction in accordance with the directive. The work force was operated on a 2-shift, overtime basis to achieve progress.
More than 9 months after the contracting officer’s representative required the prime contractor to reverse the construction sequence provided for in the contract, the prime contractor on June 11, 1955, demanded that a change order be issued to compensate the prime contractor for losses allegedly incurred as a result of the reversal in the construction sequence. This action was based on a general provision, numbered 3, in the contract covering the subject of “Changes” and providing in part as follows:
The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, *242 an equitable adjustment shall be made and the contract shall be modified in writing accordingly. * * * If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in Clause 6 hereof. * * *
“Clause 6 hereof,” referred to in the “Changes” provision of the contract, was a general provision covering the subject of “Disputes” and providing in part as follows:
Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the contracting officer, who shall reduce his decision to writing and send by registered mail, return receipt requested, a copy thereof to the contractor at his address shown herein. Within 30 days from the receipt thereof, the contractor may appeal in writing to the Chief of Engineers, whose written decision thereon, or that of his designated representative or representatives, shall be final and conclusive upon the parties hereto unless, within 30 days after the receipt thereof by the contractor, he appeals in writing to the Secretary [of the Army], which appeal shall operate to vacate said decision of the Chief of Engineers. If the dispute is determined by the Secretary, his written decision or that of his designated representative or representatives, shall, unless determined by a court of competent jurisdiction to have been fraudulent, arbitrary, capricious or so grossly erroneous as necessarily to imply bad faith, be final and conclusive upon the parties hereto. * * *
The prime contractor’s claim for additional compensation through the issuance of a change order was considered by the contracting officer. The latter denied the claim of the prime contractor in its entirety on September 14,1955.[7]
Within 30 days after the contracting officer’s action of September 14, 1955, the prime contractor took an appeal to the Chief of Engineers under the “Disputes” provision of the contract. This appeal was referred to the Corps of Engineers Claims and Appeals Board for determination, the board being the duly authorized representative of the Chief *243 of Engineers for such matters. The board conducted an extensive hearing, and then rendered a decision on June 19, 1956. This decision contained 18 findings of fact, covering in detail the history of the controversy between the parties over the sequence of construction. Upon the basis of the administrative findings, the board reached the following conclusion:
* * * [T]he changes in slab placement from the methods and sequence ordered in the letter of 5 August 1954 constitute a change in the contract. Any costs and delays suffered prior to 5 August 1954 are not com-pensable since they occurred before receipt of the decision under General Provision 2 and at the appellant’s risk, and for the further reason that said decision was rendered within a reasonable time after presentation to the Government.
The appeal is sustained and the claim remanded for a change order equitably modifying the consideration and time for performance accordingly, excluding costs and delays incurred by. appellant prior to 5 August 1954.
No appeal was taken to the Secretary of the Army from the decision dated June 19,1956, by the Corps of Engineers Claims and Appeals Board. Instead, the prime contractor and the contracting officer attempted to negotiate an equitable adjustment under the decision, but without success. Finally, no agreement between the parties having been reached, the contracting officer on November 24,1956, rendered a decision allowing the prime contractor the sum of $27,233.76 and 14 days’ additional time on the prime contractor’s claim, as remanded to the contracting officer by the Corps of Engineers Claims and Appeals Board.[8]
The prime contractor appealed to the Corps of Engineers Claims and Appeals Board from the November 24,1956, decision of the contracting officer. A hearing was held by the board, which, in addition to receiving evidence on the main claim of the prime contractor, also received evidence in support of a claim which A. & H., Inc., as subcontractor, asserted before the board in the amount of $56,715.35 as the alleged *244 additional cost of performing the electrical subcontract due to the action of the contracting officer’s representative in requiring that the “floors first” plan of construction be followed instead of the “walls and roofs first” plan. The board rendered a decision on July 25, 1958. With respect to the main claim of the prime contractor, the board remanded the matter to the contracting officer “for change order adjustments increasing the contract consideration by $44,991.61 and extending the completion date by 26 calendar days * * The board denied the separate claim of A. & H., Inc., as subcontractor, on the ground that the evidence in the record was insufficient to support this claim.[9]
An appeal was taken to the Secretary of the Army from the July 25,1958, decision of the Corps of Engineers Claims and Appeals Board. This appeal was referred to the Armed Services Board of Contract Appeals, the Secretary’s authorized representative for the determination of such matters.. After holding a lengthy hearing, the ASBCA rendered a decision on June 9, 1960. On the main claim of the prime contractor, the ASBCA increased the amount allowed to the prime contractor from $44,991.61, as previously determined by the Corps of Engineers Claims and Appeals Board, to $48,512.84. With respect to the separate claim of A. & H., Tnc., as subcontractor, the ASBCA upheld the action of the Corps of Engineers Claims and Appeals Board in denying this claim, and stated in part as follows:
* * * The contract calls for an equitable adjustment in the contract price for increased costs of performance reasonably and necessarily arising from the change order. There is no basis in this record for determining such an adjustment [for A. & H., Inc.]. * * *[10]
The present litigation was instituted after the completion of the administrative proceedings previously outlined in this opinion.
*245 It is pertinent to note that the extensive administrative proceedings under the “Changes” and “Disputes” provisions of the contract, involving two separate decisions by the contracting officer, two separate decisions by the Corps of Engineers Claims and Appeals Board rendered after hearings were held by the board, and a hearing and subsequent decision by the Armed Services Board of Contract Appeals, were undertaken and carried forward by the Department of the Army at the instigation of the prime contractor on the basis of the facts constituting the breach of contract. The extent of those proceedings clearly warrants an inference that they involved a substantial amount of time, trouble, and expense for the administrative agency. Therefore, irrespective of whether questions of fact underlying a breach of a Government contract are, as a general proposition, within or outside the scope of the standard “Disputes” provision of the contract and the related provision of the Wunderlich Act, and irrespective of whether the modification made here was basically a change or a breach of contract, it is the court’s opinion that, under the circumstances of this particular case, the prime contractor here is estopped from denying that the factual determinations made by the administrative agency are within the scope of the “Disputes” provision of the contract and the related provision of the Wunderlich Act. Cf. Callanan Road Co. v. United States, 345 U.S. 507, 513 (1953).
Of course, any estoppel applicable to the prime contractor in this respect is equally applicable to A. & H., Inc., as the electrical subcontractor, since, from the technical standpoint, actions taken by the prime contractor are necessarily binding upon the subcontractor vis-a-vis the defendant, in view of the lack of privity of contract between the defendant and the subcontractor. Severin v. United States, 99 Ct. Cl. 435, 442 (1943), cert. denied 322 U.S. 733; Kilgore et al. v. United States, 121 Ct. Cl. 340, 373 (1952).

Scope of Review

As indicated in an earlier part of this opinion, detailed, findings of fact were made by the Corps of Engineers Claims and Appeals Board as part of its decision dated June 19, 1956. Those administrative findings of fact are not attacked *246 or criticized in any way by the prime contractor or by A. & H., Inc., as the electrical subcontractor. On the contrary, all the parties to the action accept the June 19,1956, findings of fact as final and conclusive, and they are adopted as part of the findings of fact in the present action.
Actually, the prime contractor and A. & H., Inc., quarrel with the administrative determinations only in so far as those determinations deal with the amounts, if any, due the prime contractor and the electrical subcontractor as a result of the reversal of the construction sequence. The final administrative determination on these points was that of the Armed Services Board of Contract Appeals in its decision dated June 9, 1960, which allowed the prime contractor $48,512.84 and allowed nothing to A. & H., Inc., as the electrical subcontractor.
Since the present submission to the court is limited to the claim of A. & H., Inc., as the electrical subcontractor, the immediate problem before the court is to review the determination of the ASBCA that the evidence f ailed to show as to A. & H., Inc., increased costs of performance reasonably and necessarily arising from the change in the construction sequence.
The “Disputes” provision of the contract declared that if a dispute concerning a question of fact arising under the contract were determined by the Secretary of the Army (or by the Armed Services Board of Contract Appeals, as the Secretary’s representative), such determination should be final and conclusive upon the parties “unless determined by a court of competent jurisdiction to have been fraudulent, arbitrary, capricious or so grossly erroneous as necessarily to imply bad faith.” Also pertinent here is the portion of the first section of the Wunderlich Act which provides, in substance, that an administrative determination of this sort is entitled to finality only if it is “supported by substantial evidence” (41 U.S.C. §321 (1958)). Therefore, the determination by the Armed Services Board of Contract Appeals that the evidence failed to show as to A. & H., Inc., increased costs of performance reasonably and necessarily arising from the change in the sequence of construction is entitled to finality unless the court finds that the administra *247 tive determination was fraudulent, arbitrary, capricious, or so grossly erroneous as necessarily to imply bad faith, or was not supported by substantial evidence.

Available Evidence

The evidence before the court consists of (1) facts agreed to by the parties in the pleadings, (2) other facts agreed to by the' parties during the course of pretrial proceedings under [former] Rule 28 [now Rules 43-45], and (3) portions of the administrative record that were selected and offered by the plaintiffs and were admitted in evidence over the defendant’s objection that the plaintiffs were under an obligation to offer the administrative record in its entirety. The defendant declined to offer any evidence, including the administrative record in its entirety or any parts thereof, although notified by the Commissioner that the whole administrative record or any portions of it selected by the defendant would be admitted in evidence if offered by the defendant.
The defendant takes the position that the court is powerless to proceed on the basis of selected portions of the administrative record, and that the court must necessarily dismiss the petition as to A. & H., Inc., because the plaintiffs failed to offer the whole administrative record in support of the subcontractor’s claim.
It is the court’s view that the defendant’s position on this point is untenable.
In the first place, there was an express agreement between the parties prior to the trial that either side might offer selected portions of the administrative record in evidence at the trial. This agreement was incorporated in an exchange of letters.
A letter dated June 10, 1963, from defendant’s counsel to the attorney for A. & H., Inc., stated in part as follows:
* * * [W] e will not oppose the offer by you of any fart of the administrative record during the presentation of your case and we agree this can be done by reference, i.e., even though the documents you wish to introduce are not actually present in Tyler at the time of trial. * * * You will note that, in the event you do not offer the entire administrative record in this case, * * * we have reserved the right to do so. * * * [Emphasis supplied.]
*248 The letter of June 10, 1963, was responded to by the attorney for A. & H:, Inc., under the date of June 17, 1963. Tire reply stated in part as follows:
We readily join in the agreement proposed in the third paragraph of your letter of June 10, whereby either party to the above may offer any 'part of the ad-mmistrative record during the trial by reference, even though the documents sought to be introduced are not actually present in Tyler at the time of the trial. * * * [Emphasis supplied.]
Therefore, the admission in evidence of portions of the administrative record selected and offered by the plaintiffs was in accordance with the pretrial agreement of the parties that “any part” of the administrative record could be offered in evidence by either side at the trial.
In the pretrial agreement, the defendant reserved the right to offer other portions of the administrative record, or the entire record, but it specifically declined to exercise this right despite several reminders by the Commissioner during the course of the trial. This decision by defendant’s counsel on a matter of trial strategy was, of course, his prerogative, but defendant’s counsel could not thereby cast on the plaintiffs the burden of offering the whole administrative record or additional parts of the administrative record, in violation of the pretrial agreement.
In the second place, the defendant’s contention relative to the point now under consideration is based on the Supreme Court’s decision in the BiancM case, but the defendant would expand the scope of BiancM far beyond that indicated by the Court. The Supreme Court was dealing in the BiancM case with the previous action of this court in going outside the administrative record by receiving and considering additional evidence in connection with a review of administrative determinations made under the standard “Disputes” provision of a Government contract. The Supreme Court held that this court’s action in going outside the administrative record was erroneous, because “apart from questions of fraud, determination of the finality to be attached to a departmental decision on a question arising under a ‘disputes’ clause must rest solely on consideration of the record before the department” (373 U.S. at p. 714). The Court did not *249 hold that, in reviewing administrative determinations made under the standard “Disputes” provision of a Government-contract, this court must demand, receive, and consider everything in the administrative record, including portions that have no relationship to the issues that are before the court for decision.
In any litigated case, including a case involving a Government contract, it is the task of a court to adjudicate the issues that are in controversy; and it is the responsibility of the attorneys for the parties to select and present to the court those items of evidence which they regard as pertinent to the issues in controversy and as supporting their respective theories of the case.
In this connection, it should be noted that the present submission to the court is limited to the claim of A. & H., Inc., as the electrical subcontractor. Since that claim is for the relatively modest amount of approximately $56,000, in comparison with the prime contractor’s main claim in the amount of approximately $892,000, it is reasonable to suppose that substantial portions of the administrative record relate only to the main claim of the prime contractor and are wholly irrelevant to the subsidiary claim of A. & H., Inc., as the electrical subcontractor. Furthermore, with respect to the claim of A. & H., Inc., there is only one factual determination of the administrative agency that is questioned by the plaintiffs in the present proceeding, i.e., the determination that the record did not show as to A. & H., Inc., increased costs of performance reasonably and necessarily arising from the change in the construction sequence. It seems certain that much of the administrative record relates to other factual issues that are not now in controversy.
In such a situation, there is certainly no requirement in Bianehi that this court must burden itself by demanding, receiving, and considering the whole administrative record in order to select those documents and portions of documents that have a bearing on the relatively narrow factual issue that is in dispute. Father, it is the responsibility of the attorneys for the parties to undertake, in the first instance, the process of winnowing the whole administrative record and bringing to the court’s attention the portions which they *250 severally wish the court to consider in passing on the issue in controversy. It was evidently in recognition of this responsibility that the attorneys here entered into the pretrial agreement previously mentioned.
It is the court’s opinion, therefore, that under the circumstances of this case, the court is not required to reject the claim of A. & H., Inc., merely because the plaintiffs have failed to submit the whole administrative record in support of the subcontractor’s claim and, instead, have submitted selected portions of such record in accordance with the pretrial agreement between the parties. It necessarily follows that the court may properly proceed to consider and adjudicate the claim of A. & EL, Inc., on its merits and in the light of the evidence that the parties have seen fit to make available to the court.

Review of Administrative Determination

As stated in an earlier portion of this opinion, the administrative determination that is before the court for review at the present time is that of the Armed Services Board of Contract Appeals to the effect that the evidence failed to show as to A. & H., Inc., increased costs of performance reasonably and necessarily arising from the change in the construction sequence.
The portions of the administrative record before the ASBCA that were offered and admitted in evidence at the trial show that the action of the contracting officer’s representative in directing that the sequence of construction provided for in the contract be reversed, and the action of the prime contractor in following such directive, interfered substantially with the performance of the electrical work by A. & H., Inc. Most of the electrical work (i.e., from 70 to 80 percent) was to be done on the walls or ceilings of the buildings that were to be erected under the contract. The bid of A. & EL, Inc., on the electrical subcontract, and its plans for the performance of the electrical work, were coordinated with the original construction plans of the prime contractor and contemplated that the walls and roofs of the buildings would be constructed before the concrete floor slabs were placed in the respective buildings. The subcon *251 tractor’s plans were based on an assembly line method of work, and it was a prerequisite to the successful execution of such plans that the walls and roofs of the buildings should be constructed on schedule, and thus be available for the performance of the electrical work, in accordance with the construction sequence originally planned by the prime contractor. When the prime contractor reversed the construction sequence from the “roofs and walls first” plan of construction to the “floors first” method of construction, in accordance with the directive of the contracting officer’s representative, this compelled A. & H., Inc., to perform the electrical work in a piecemeal fashion rather than in accordance with the assembly line method originally contemplated, it created confusion on the part of the subcontractor’s personnel, it hampered the efficiency of the subcontractor’s operations, it delayed the completion of the electrical work for several months beyond the date when such work would otherwise have been completed, and it substantially increased the subcontractor’s costs of performance.
In view of the facts thus shown by the portions of the administrative record that were offered and admitted in evidence at the trial, it must be concluded that the determination of the Armed Services Board of Contract Appeals to the effect that the evidence failed to show as to A. & H., Inc., increased costs of performance reasonably and necessarily arising from the change in the construction sequence was not supported by substantial evidence. Therefore, the administrative determination on this point is not entitled to finality under the Wunderlich Act, so as to bar A. & H., Inc., from recovering in the present action whatever amount is shown by the record to represent such increased costs. WPC Enterprises, Inc. v. United States, 163 Ct. Cl. at 8-9.

Amount of Damages

In the absence of any attempt by the administrative agency to fix the amount of the increased costs that were incurred by A. & H., Inc., as the result of the reversal of the construction sequence, the court may proceed to determine such amount without contravening the Wunderlich Act, as inter *252 preted. by the Supreme Court in its Bianchi decision. Stein Bros. Mfg. Co. v. United States, 162 Ct. Cl. at p. 808.
The evidence before the court bearing on this point consists in part of portions of the administrative record that were offered and admitted in evidence at the trial, and in part of facts that were agreed to by the parties during the pretrial proceedings under [former] Rule 28 [now Rules 43-45]. When all these data are evaluated, it appears that the increased costs of performance that were incurred by A. & EL, Inc., as the result of the reversal of the construction sequence amounted to approximately $18,188.82.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Mastín Gr. White, and the briefs and argument of counsel, makes findings of fact as follows:
1. On May 26, 1954, H. R. Henderson & Company and A. & IT., Inc., two Texas corporations operating as a joint venture, entered into a contract with the defendant (represented by a contracting officer of the Corps of Engineers, Department of the Army) for the construction of buildings at the Longhorn Ordnance Works, located near Karnack, Harrison County, Texas. The contract was numbered DA-34-066-eng-4150, and it provided for the payment of $2,480,-479.76 to the joint venture for the furnishing of all labor, equipment, and materials (with exceptions not pertinent to this litigation) and the performance of the work called for under the contract. (For the sake of convenience, this contract will usually be referred to hereafter in the findings as “the contract.”)
2. (a) The contract contained a general provision, numbered 2, covering the subject of “Specifications and Drawings,” which stated in part as follows:
* * * In any case of discrepancy either in the figures, in the drawings, or in the specifications, the matter shall be promptly submitted to the Contracting Officer, who shall promptly make a determination in writing. Any adjustment by the Contractor without this determination shall be at his own risk and expense. * * *
*253 (b) The contract contained the following general provision, numbered 3, covering the subject of “Changes”:
The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and. the contract shall be modified in writing accordingly. Any claim of the Contractor for adjustment under this clause must be asserted in writing within 30 days from the date of receipt by the Contractor of the notification of change: Provided, however, That the Contracting Officer, if he determines that the facts justifiy such action, may receive and consider, and adjust any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in Clause 6 hereof. But nothing provided in this clause shall excuse the Contractor from proceeding with the prosecution of the work as changed. Except as otherwise herein provided, no charge for any extra work or material will be allowed.
(c) The contract contained the following general provision, numbered 6, covering the subject of “Disputes”:
Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the contracting officer, who shall reduce his decision to writing and send by registered mail, return receipt requested, a copy thereof to the contractor at his address shown herein. Within 30 days from the receipt thereof, the contractor may appeal in writing to the Chief of Engineers, whose written decision thereon, or that of his designated representative or representatives, shall be final and conclusive upon the parties hereto unless, within 30 days after the receipt thereof by the contractor, he appeals in writing to the Secretary, which appeal shall operate to vacate said decision of the Chief of Engineers. _ If the dispute is determined by the Secretary, his written decision or that of his designated representative or representatives, shall, unless determined by a court of competent jurisdiction to have been fraudulent, arbitrary, capricious or so grossly erroneous as necessarily to imply bad faith, be final and conclusive *254 upon tbe parties hereto. The Chief of Engineers or the Secretary may designate an individual, or individuals, other than the contracting officer, or a board as his authorized representative to determine appeals under this article. In connection with any appeal proceeding under this clause, the contractor shall be afforded an opportunity to be heard and offer evidence in support of his appeal. Pending final decision of a dispute hereunder the contractor shall proceed diligently with the performance of the contract and in accordance with the contracting officer’s decision.
3. Under the joint venture agreement between H. E. Henderson & Company and A. & H., Inc., the former had a 90 percent interest and the latter had a 10 percent interest in the contract. The agreement also provided that H. E. Henderson & Company should have complete administrative authority for the performance of the work under the contract, and should sign for, receive, and distribute all money derived from the performance of the contract. (For the sake of convenience, the joint venture will usually be referred to hereafter in the findings as “the prime contractor.”)
A. There were to be concrete floor slabs, with accompanying walls and roofs, in the buildings that were to be constructed under the contract.
5. (a) Among other things contemplated by the contract was the performance of electrical work within and upon the buildings designated in the contract.
(b) At about the time when the contract was made, A. & H., Inc., acting for itself, and H. E. Henderson & Company, acting for the joint venture, entered into a subcontract under which A. & H., Inc., was to do the electrical work under the contract for $239,390.[11]
6. A notice to proceed under the contract was given to the prime contractor by the defendant on June 11,1954.
7. (a) The original completion date of the entire contract, including the electrical work, was January 10,1955, as estimated in the prime contractor’s bid.
(b) As a result of the issuance of change orders by the contracting officer (not including the order that is involved *255 in subsequent findings), the time for the completion of the contract, including the electrical work, was extended to May 1,1955.
8. Fairly soon after work was begun under the contract, a dispute arose between the prime contractor and personnel of the defendant with respect to whether, in connection with the erection of the buildings, the contract should be interpreted as providing that the roofs and walls would be constructed before the concrete floor slabs were placed, or as providing that the concrete floor slabs would be placed first. The dispute grew out of a discrepancy between the drawings and the specifications that were attached to and formed part of the contract. The prime contractor argued that the first of the two interpretations previously mentioned was the correct one. This dispute was finally resolved by a representative of the contracting officer in favor of the “roofs and walls first” plan of construction for which the prime contractor had contended. The administrative decision was incorporated in a letter dated August 5, 1954, to the prime contractor, stating in part as follows:
This is to confirm telephonic information given Mr. John Henry of your organization, 2 August 1954, at which time Mr. Henry was informed by the writer that the placement of structural floor slabs after roofs had been constructed and in accordance with your proposed method of construction was approved * * *.
9. Notwithstanding the administrative decision referred to in finding 8, a representative of the contracting officer on August 24, 1954, issued an oral directive to the prime contractor, requiring that the sequence of construction previously agreed upon be reversed and that the prime contractor adopt a plan of construction whereby the concrete floor slabs would be poured before the walls and roofs of the buildings were constructed. Thereafter, the prime contractor, under protest but with vigor, launched into and carried out a “floors first” method of construction. The work force was operated on a 2-shift, overtime basis to achieve progress.
10. More than 9 months after the contracting officer’s representative required the prime contractor to reverse the construction sequence, the prime contractor on June 11, 1955, de- *256 mancled that a change order (see finding 2(a)) be issued to compensate the prime contractor for losses allegedly incurred as a result of the reversal in the construction sequence.
11. On September 14, 1955, the contracting officer denied the June 1955 claim of the prime contractor in its entirety. •
12. On October 5, 1955, the prime contractor appealed from the contracting officer’s action of September 1955 (see finding 11) to the Chief of Engineers under the “Disputes” Clause of the contract (see finding 2(b)).
13. (a) The prime contractor’s appeal (see finding 12) was referred to the Corps of Engineers Claims and Appeals Board for determination. The subsequent proceedings before the board were assigned the number 938.
• (b) After an extensive hearing that was held in Dallas, Texas, commencing January 31,1956, the Corps of Engineers Claims and Appeals Board rendered a decision in No. 938 on June 19,1956.
(c) The board’s decision in No. 938 contained 18 findings of fact, as follows:
(1) Government counsel stipulated at the hearing, in' the presence and with the assent of the contracting officer, that all acts of the Government’s project engineer, A. B. Elias, in connection with the administration of this contract were fully authorized as the acts of the contracting officer (Tr. pp. 21, 22). The authority of the project engineer is not in dispute.
(2) Appellant’s [i.e., the prime contractor’s] project manager, John Henry, testified he prepared appellant’s bid and, insofar as material here, based it upon that sentence of specification paragraph 3-22 which reads: “slabs ON GRADE: Concrete floor slabs shall not be placed before roof is on the building.” He considered the terms “slabs on grade” and “concrete floor slabs” to comprehend any and all ground level concrete floor slabs formed on the earth, whether structural or nonstructural (floating) , since these sub-types are nowhere otherwise defined in the contract. His progress chart, floor finishing subcontracts, material delivery schedules and other facts clearly show that the modus operandi contemplated was to erect roofs before laying the ground floor slabs.
(3) Soon after award a flooring subcontractor raised the question of a conflict between this specification and the LOWC plans which require the pouring of floors integrally and more or less contemporaneously with the *257 grade beams, walls, piers and columns and before the roof was in place. This subcontractor conditioned his bid upon a slab-last sequence because of the conflict and the difficulty and expense of pouring and protecting the nonsparking, nonconductive special finishes on slabs before the adjacent superstructure of a building had been raised. Henry then recognized that pursuant to General Provision 2 of the contract the question would have to be presented to the contracting officer for decision, but he continued to marshal men, materials and equipment as originally scheduled over a period of about 6 weeks without promptly submitting it in accordance with that contract article.
(4) On 14 July 1954 appellant first broached the matter of conflict over the slab-roof sequence in a letter submitting a shop drawing which says in part:
Please note that on Sheet #2, we have indicated in yellow pencil where we would be required to break the pores (sic) in order to put down the floors and bases after the roof is on, as required by Specifications. The additional steel required is in Section 37-37, where dowels are added to take care of the floor slab.
(5) On 19 July 1954, another letter captioned “slabs on gkade” recited the sentence from specifications paragraph 3-22 and submitted drawings entitled “Proposed Changes of all Sections at Floor Line.” It was designed to accomplish the changes in the LOWC drawings necessary for a slab-after-roof construction.
This letter and the one of the 14th were referred to the architect-engineers for the project who wrote to the District Engineer on 29 July confirming previous discussions and interpreting paragraph 3-22 of the specifications as not applying to structural concrete slabs, but only to “slabs on grade”. The A-E argued, “Structural slabs are not ‘slabs on grade’, but are supported on a system of beams and piers through which the loads are carried to a foundation material several feet below grade,” and recommended disapproval (Exhibit G-17).
(6) The engineering and construction personnel of the District Office at first accepted the A-E’s definition of a structural slab as distinguished from a nonstructural slab, which was later defined as a slab resting upon and drawing all its support from compacted earth beneath. They ruled that under such definition, paragraph 3-22 applied only to nonstructural slabs, leaving structural slabs to be placed as shown on the LOWC drawings. The appellant’s shop drawings showing *258 modification in LOWC plans necessary to accommodate the roof first-slab last procedure were disapproved and appellant so notified.
(7) Thereupon appellant’s project manager wrote a letter of emphatic protest and notice of claim on 28 July 1954, in which it outlined its position and the effect of the disapproval as follows:
Paragraph 3-22, of the Contract Specifications states, “concrete floor slabs shall not be placed before the roof is on the building.”
1. Our original proposal, dated May 25, 1954, was prepared on the basis of complying with this method of construction.
2. Progress Schedule, dated June 30, 1954, (submitted to your office), indicated compliance with this method.
3. Our entire organization is geared for this method, and our awarding of subcontracts, purchasing of materials, purchasing of equipment, scheduling of drawings, prosecution of the work, and the actual layout of the field work has been in compliance with this method of construction.
jJj *!» «J»
You are hereby advised that to do an about face at this time will result in untold confusion, real and substantial delay in completion date and in a substantial addition in costs, the exact amount of which we are unable to determine at this early hour, but as soon as time permits this office will submit to you detailed estimates of the additional time and costs involved.
(8) A series of personal and telephonic consultations between the District’s and appellant’s representatives then followed, the upshot of which was the reversal by the District of its previous stand and approval of the contractor’s interpretation, changes and shop drawings, with minor modifications not material here. On 2 August 1954 the District notified its project engineer that the contractor’s proposed changes of all sections at floor lines, providing for the placing of concrete ground level floors after roofs had been constructed without distinction as to their structural or nonstructural character, was approved. The approval was conveyed to appellant that day and confirmed in writing on 5 August 1954 in a letter by the project engineer which relevantly reads:
This is to confirm telephonic information given Mr. John Henry of your organization, 2 August 1954, at which time Mr. Henry was informed by the writer that *259 the placement of structural floor slabs after roofs had been constructed and in accordance with your proposed method of construction was approved.
if: ❖ # ❖
(9) This letter is the only one appellant ever received in response to its submission of “proposed changes” in the LOWC drawings. Appellant was never notified of, nor does the Government claim, any repudiation or qualification of this approval. Appellant believed and still believes that the letter which passed directly upon the central question of roof-slab sequence of structural slab placement, was the determination of the conflict it was entitled to under General Provision 2. The Contracting Officer so considered it as to the methods of construction involved. (Tr.pp.26,27,28.)
(10) During the interval between notice of rejection of the contractor’s proposed change on 26 July and notice of its final approval on 5 August, the contractor laid off crews of carpenters, rescheduled shipments of materials and otherwise reacted to conform to the LOWC drawings. Upon confirmation of approval it reinsti-tuted orders and instructions to proceed as initially planned. For a brief time all seemed tranquility and accord. Plowever, a discordant note was soon struck. In an encounter between the project engineer, Elias, and appellant’s superintendent Frank Horn on 9 August, the latter testified that Elias remarked to the effect that the contractor was not going to be allowed to build according to the decision of 5 August. Horn immediately afterwards entered this incident in his job log as follows:
Mr. Elias, of the United States Engineers, advised the superintendent to carry on the work as directed by his department regardless of the plans and specifications. (Tr. p. 728.)
Horn reported this to Henry, the project manager, who instructed him to carry on and not to vary from the contract unless Elias gave him a letter. (Tr. 512, 720.) Horn did so, but on 24 August, just as appellant was ready to pour the first grade beam in priority Building 1517-7, with steel dowels in the forms for tieing in with the reinforcing slab steel after the roof was up, Government inspector W. J. Cartwright stopped the pour. Neither Horn nor Henry were present, nor were they advised of this stoppage by anyone on the engineer’s project staff. Cartwright merely told the ■foreman in charge that slabs would have to be poured *260 before roofs in accordance with LOWC drawings. He recorded his instructions in his official daily log under date of 24 August 1954.
Instructions from the supervisor, Mr. I-Iarrison (Chief Inspector). Floor slabs and curbs shall be placed in accordance with LOWC drawings. Structural slabs to be placed before the roof in [sic] on the buildings. (Tr. p. 812.)
Cartwright testified, “That is exactly what I told him.” (Tr. p. 812.) This directive had been given to Harrison in the same form by Elias on the previous day (Tr. pp. 229,244, 245, 251). Harrison’s log for the date records:
Question of slab steel settled today. Mr. Elias rules it should be installed as shown on plans (LOWC). This eliminates cutting and splicing and also means structural slabs must be placed before the roofing. (Tr. p. 884).
The steel for dowels was torn from the forms that same day in obedience to Cartwright’s order. (Tr. 813).
(11) When Henry learned of this occurrence and inquired its meaning of Elias, he was told that the 5 August decision could not be executed until the contractor submitted a “design analysis” of the change. There was nothing in the decision changing LOWC plans or in the contract requiring a design analysis. Furthermore, Elias confessed himself incompetent to either make or interpret a design analysis (Tr. p. 235). He did not communicate his demand for a design analysis to the contractor in writing, nor to the District or Architect Engineer in any manner until it was disclosed at a conference at the project site on 2 September 1954. On that occasion the District Chief of the Construction Division, E. A. Cornell, expressly told Elias that there was no warrant or need for a design analysis (Tr. p. 311, 922).
(12) The only thing required to implement the decision of 5 August was, in Cornell’s opinion, a simple sketch showing the manner in which interior beams and curbs would be doweled for tie-ins with the slab steel when the slabs were later put down. There is much credible evidence that the steel doweling was already sufficiently described and shown in the approved shop drawings, slab steel schedules and LOWC drawings for the upper floors, so that further submission of a dowel sketch was unnecessary. However, Henry acceded to Cornell’s request in order to progress the work.
(13) The two priority buildings, Nos. 1517-7 and 1502-1, were due for completion on 27 October 1954. *261 Progress had been stalled by the stoppage and directives of 24 August. Haste in handling the dowel sketch and resumption of work was of paramount importance. Cornell therefore gave explicit instructions that the sketch was to be submitted to Elias and by him cleared with the A-E by telephone within 48 hours, or by the 4th of September (Tr. p. 945). The sketch was so simple and so minor a detail that it could have been cleared by telephone within an hour or two at the time of the conference (Tr. p. 949, 950), or approved on the site by Cornell, who eventually did approve it.
(14) The sketch was delivered to Elias’ office by special messenger in the late afternoon of 3 September. When he saw it, Elias admits he knew what it was and whence it came (Tr. pp. 322, 323), but took no action on it, expeditious or otherwise, because it was not transmitted in a “proper manner” (Tr. p. 321). By that phrase Elias meant the sketch was not accompanied by a letter of transmittal (Tr. p. 324).. So he just “sat on the dowel sketch” (Tr. p. 327), refusing any action whatever.
(15) After several exchanges about the sketch and upon discovering the extremity of Elias’ intransigeance, Henry wrote Elias a letter on 13 October telling him what he already knew, i.e., that the dowels sketch had been prepared as requested and delivered to Elias’ office by special messenger on 3 September. Elias continued to sit on the sketch until 18 October when he transmitted it by mail — not by telephone, to Cornell — not to the Architect-Engineer, and without asking urgent consideration of it. Cornell returned it approved by indorsement on 21 October. Elias sat on it some more until 26 October when he wrote appellant advising of its receipt and approval. Appellant received this letter on 27 October 1954, the very day the priority buildings were originally scheduled for completion.
(16) By then it was too late. For by letters, personal exhortations and threats on 25 August 1, 2, 9, 10, 15, 21 and 22 September and 1,4, 5, 7,11 and 20 October, Elias forced appellant into proceeding with slab-first construction in compliance with the LOWC drawings as noted in the referenced log entries. In the incident of 25 August, Elias told appellant’s representatives that if they refused to follow the LOWC drawings “. . . the writer (Elias) would remove all inspectors and let. him buy the job and, in all probability, action would be taken to close the construction work until Henderson made up their mind to construct buildings in accordance with plans.” *262 (Elias’ Log, Aug. 25, 1954). Under the compulsion of this threat and Cornell’s directions at the 2 September meeting to advance the work as rapidly as possible pending clearance of the dowel sketch, which clearance was not promptly forthcoming, appellant launched into slab-first construction under violent protest but with vigor on a two-shift, overtime basis, to achieve progress. _
_ (17) Elias was measuring progress by the original schedule which had long been rendered obsolete by change orders and the transition in construction procedure on which it was based. (Tr. p. 334). The net effect was acceleration of this phase of work ahead of a properly corrected schedule. By 27 October, appellant had poured most of the floor slabs in 24 buildings, and some in 3 others. In the remaining buildings the floor slabs came after roofing (Stipulation). Appellant was then so deeply committed to the slab-first sequence of the LOWC plans it could not switch back without further wrench to its operative routine. (Tr. p. 339). It so informed Elias in its letter of 27 October, acknowledging receipt that date of the dowel sketch approval.
(18) Appellant protested all these circumstances on several occasions. In a letter of 7 October, it reviewed the course of affairs, flatly asserted that it was being forced to build the job by the project engineer’s methods of construction instead of by the plans as changed, insisted it was ahead of schedule and not behind, and complained of delays being caused by the project engineer’s lack of cooperation. Elias forwarded this letter to Cornell and defended his actions and inactions by terming the approved changes in the LOWC plans on slab-roof placement as “impractical” and not in accordance with ‘‘design criteria.” He stated he would not permit appellant to place reinforcing steel in accordance with the changes until “they submit their proposed alternate design with design analysis and other requirements.” He also reiterated his refusal to forward the dowel sketch until he received a letter of transmittal (Exhibit G-34). At the hearing Elias admitted his lack of cooperation in the dowel sketch transmittal-design criteria affairs (Tr. pp. 329, 335, 967), and the invalidity of the progress schedule (Tr. p. 334). These matters were not concurrently brought to the contracting officer’s personal attention (Tr. pp. 37,40), and there is no showing that he was ever fully informed of their compass and extent.
*263 (d) On the basis of the administrative findings of fact set out in paragraph (c) of this finding, the board’s decision in No. 938 reached the following conclusion:
* * * [T]he changes in slab placement from the methods and sequence ordered in the letter of 5 August 1954 constitute a change in the contract. Any costs and delays suffered prior to 5 August 1954 are not compensable since they occurred before receipt of the decision under General Provision 2 and at the appellant’s risk, and for the further reason that said decision was rendered within a reasonable time after presentation to the Government.
The appeal is sustained and the claim remanded for a change order equitably modifying the consideration and time for performance accordingly, excluding costs and delays incurred by appellant prior to 5 August 1954.
(e) No appeal was taken to the Secretary of the Army from the board’s decision in No. 938.
¡14. The administrative findings of fact set out in finding 13 (c) are not attacked or criticized in any way by the prime contractor or by A. & H., Inc., as subcontractor. On the contrary, all the parties to the present action accept such administrative findings of fact as final and conclusive. Therefore, the administrative findings of fact set out in finding 13(c) are adopted as part of the findings of fact in the present action.
15, (a) After the decision of the Corps of Engineers Claims and Appeals Board in No. 938 (see finding 13) was rendered, the prime contractor and the contracting officer attempted on several occasions to negotiate an equitable adjustment, but without success.
(b) On November 24, 1956, the contracting officer rendered a decision allowing the prime contractor the sum of $27,233.76 and 14 days’ additional time on the prime contractor’s claim, as remanded to the contracting officer by the board’s decision in No. 938.
16. (a) The prime contractor appealed to the Corps of Engineers Claims and Appeals Board from the November 1956 decision of the contracting officer (see finding 15(b)). The subsequent proceedings before the board on this appeal were assigned the number 1170.
*264 (b) A hearing was held before the board in No. 1170. During the course of the hearing, the board, in addition to receiving evidence on the main claim of the prime contractor, also received evidence in support of a claim which A. & H., Inc., as subcontractor, asserted before the board in the amount of $56,715.35 as the alleged additional cost of performing the electrical subcontract due to the action of the contracting officer’s representative on August 24,1954, in requiring that the “floors first” plan of construction be followed instead of the “walls and roofs first” plan previously agreed upon between the parties.
(c) The board rendered its decision in No. 1170 on July 25, 1958.
(d) With respect to the main claim of the prime contractor, the board’s decision in No. 1170 remanded the matter to the contracting officer “for change order adjustments increasing the contract consideration by $44,991.61 and extending the completion date by 26 calendar days * *
(e) With respect to the separate claim of A. & H., Inc., as subcontractor, the board’s decision in No. 1170 stated in part as follows:
It is the further finding of this Board as a matter of record that the asserted excess costs to A&H by reason of the slab change is $57,519.42, amended to $56,715.35, derived as the difference between its alleged bid estimate of original costs on electrical work in the amount of $281,480.46 (exclusive of $39,650.68 as profit); and its actual, experienced costs due to the slab change of $344,940.51. Of the $63,789.67 remainder after deduction of the estimated from the actual, $56,715.35 is assigned to the slab change (See Supp. to Appeal, A&H). The accuracy of this accounting is sworn to by Joe B. Jones, President of A&H, notarized certificate attached.
But John M. Henry, who assembled the joint venture’s estimate and prepared its bid, read into evidence that the bid of A&H to Henderson for performance of the electrical work was only $222,641, and appellant’s bid to the Government was based on such figures (Tr. p. 67 et seq.). Furthermore, A&H filed with the Board a photostatic copy of its bid to Henderson attached as Exhibit “A” to its complaint in civil action No. 19,622 in the District Court of Harrison County, Texas, styled A&H, *265 Inc., vs. R. H. Henderson Co., et al. This bid was signed by Joe B. Jones, President, and is in the amount of $212,641.88. The complaint alleges in count IV thereof that defendant Henderson accepted that bid.
If A&H has correctly represented itS' cost data, it bid the original electrical work at $68,838.58 less than its estimate of costs, without profit. Taken as true, all of its alleged losses are explained by its underbidding of the job, and none are due to the slab change.
Conversely, if A&H has misrepresented its cost data, the fabric of its claim is rent beyond redemption. There is no other evidence in the record. In such equivocal posture this claim is inexorably transfixed.
The claim is denied.
17. (a) An appeal was taken to the Secretary of the Army from the decision of the Corps of Engineers Claims and Appeals Board in No. 1170 (see finding 16). The appeal was referred to the Armed Services Board of Contract Appeals for determination, and was docketed as ASBCA No. 5146.
(b) After holding a lengthy hearing, the Armed Services Board of Contract Appeals rendered a decision in ASBCA No. 5146 on June 9,1960.
(c) The decision in ASBCA No. 5146 on the main claim of the prime contractor increased the amount allowed to the prime contractor from $44,991.61 (see finding 16(d)) to $48,512.84.
(d) With respect to the claim of A. & H., Inc., as subcontractor, the decision in ASBCA No. 5146 stated in part as follows:
This claim is for increased costs allegedly arising from the change order as to electrical work performed by A. & H., Inc. Seventy to eighty per cent of the electrical work was to be performed on the walls of the various buildings. The order therefore to place the floor slabs first merely delayed the electrical contractor but did not increase his labor or material costs so far as the performance of the work is concerned. Since the electrical contractor was on the job prior to the issuance of the change order, it may have incurred some expense due to the delay in starting the bulk of its work.
*266 So far as we can see from the record herein, some of the work of the contractor was delayed in point of time by the change order, but it is not shown that there were increased costs arising directly from such delay. The contractor originally expected to complete the work on 10 January 1955. A change order affecting the electrical work extended this to 26 February 1955 according to A. & H. It claims all expenses from and after 1 March 1955 for seven to seven and one-half months, or the actual completion date of its work. Not included in its calculations is the extension by some thirty-four change orders of the time for performance of the prime contractor to 1 May 1955.
‡ ‡ ‡
, * * * The contract calls for an equitable adjustment in the contract price for increased costs of performance reasonably and necessarily arising from the change order. There is no basis in this record for determining such an adjustment. The mere fact that the work continued for twice the period contemplated by the contractor is not sufficient, as illustrated by the fact that other change orders extended the period almost four of the seven and one-half months claimed, and the admitted inefficiency of the prime contractor.
For the reasons set out herein and by the Engineers Board in its decision No. 1170 this part of the appeal is denied.
18. The action of the contracting officer’s representative in directing that the sequence of construction provided for in the contract be reversed, and the action of the prime contractor in following such directive, interfered with the performance by A. & H., Inc., of the electrical work under the contract pursuant to the subcontract between the prime contractor and A. & H., Inc. Most of the electrical work (i.e., from 70 to 80 percent) was to be done on the walls or ceilings of the buildings that were to be erected under the contract. The bid of A. & H., Inc., on the electrical subcontract, and its plans for the performance of the electrical work, were coordinated with the original construction plans of the prime contractor and contemplated that the walls and roofs of the buildings would be constructed before the concrete *267 floor slabs were placed in the respective buildings. The subcontractor’s plans were based on an assembly line method ■of work, and it was a prerequisite to the successful execution of such plans that the walls and roofs of the buildings should be constructed on schedule, and thus be available for the performance of. the electrical work in accordance with the construction sequence originally planned by the prime contractor. When the prime contractor reversed the construction sequence from the “roofs and walls first” plan of construction to the “floors first” method of construction, in accordance with the directive of the contracting officer’s representative, this compelled A. & H., Inc., to perform the electrical work in a piecemeal fashion rather than in accordance with the assembly line method originally contemplated, it created confusion on- the part of the subcontractor’s personnel, it hampered the efficiency of the subcontractor’s operations, it delayed the completion of the electrical work for about 4y2 months beyond the date when such work would otherwise have been completed, and it increased the subcontractor’s costs of performance to the extent of approximately $18,188.82 (see finding 19).
19. The following represents a breakdown of the increased costs of performance that were incurred by A. & H., Inc., as the electrical subcontractor because of the action of the contracting officer’s representative in directing that the sequence of construction provided for in the contract be reversed:
Productive Labor_$1,988.92
Supervision_:_ 6, 319.31
■Warehouse Expense_ 1, 802. 61
Insurance and Taxes on above items_ 850. 64
Equipment Expense_ 1, 376.73
Tool Expense_ 263.16
Eield Office Expense_ 883. 85
Truck and Automobile Expense_ 1, 783.49
Traveling Expense_ 978.56
Total Direct Cost_ 16,247.27
Overhead at 11.95 percent_ 1,941. 55
Total Damages. 18,188. 82
*268 20. (a) A letter dated June 10, 1968, from, tbe Department of Justice to tbe attorney for A. & H., Inc., stated in part as follows:
We are not prepared at this time to stipulate that tbe record or any part thereof can be offered at tbe trial but we will not oppose tbe offer by you of any part of the administrative record during the presentation of your case and we agree this can be done by reference, i.e., even though the documents you wish to introduce are not actually present in Tyler at the time of trial. These documents can then be transferred to the custody of the Court in Washington, D.C. You will note that, in the event you do not offer the entire administrative record in this case, including the proceedings in Docket Nos. 938 and 1170, Corps of Engineers Appeals Board, and Docket No. 6146, Armed Services Board of Contract Appeals, we have reserved the right to do so. * * *
(b) The letter of June 10, 1963, was responded to by the attorney for A. & H., Inc., under the date of June 17, 1963. His reply stated in part as follows:
We readily join in the agreement proposed in the third paragraph of your letter of June 10, whereby either party to the above may offer any part of the administrative record during the trial by reference, even though the documents sought to be introduced are not actually present in Tyler at the time of the trial. _ We will join you in agreeing that copies of the depositions and exhibits offered in Docket Nos. 938 and 1170, Corps of Engineers Appeals Board, and Docket No. 5146, Armed Services Board of Contract Appeals, may be used on the trial by either party without authentication, but subject to objections as to admissibility.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are entitled to recover for the use and benefit of A. & H., Inc., and it is therefore adjudged and ordered that the plaintiffs recover of and from the United States, for the use and benefit of A. & H., Inc., the sum of eighteen thousand one hundred eighty-eight dollars and eighty-two cents ($18,188.82).

 In reviewing the decisions of administrative agencies, it is customary, as we understand it, for most courts of appeals to confine their scrutiny of the administrative record to those parts of the record specified by the parties.

 The defendant does not argue that, on the the basis of the parts of the administrative record before him, the Commissioner erred in concluding that the administrative determination was inadequately supported.

 The Commissioner did offer at the trial, as his own exhibits, certain materials which had been submitted at pre-trial. Some of these materials were in the nature of briefs or legal arguments. The memoranda with evidentiary content bore on the question of damages, not on the issue of whether there was any loss to plaintiffs for which defendant was liable. Even as to the memoranda with evidentiary content, there is no indication that the Commissioner admitted them as proof of disputed statements of fact. The purpose of the admissions was (a) to show what facts were undisputed and therefore agreed upon, and (b) to place in the record the parties’ pre-trial arguments on damages.

 Defendant has given us neither a discussion of plaintiffs’ exceptions on damages nor any discussion directed to the substance of the findings on damages.

 Plaintiffs now claim that some of the equipment was not owned by the subcontractor biit was rented from others. Por the delay period which we find involved, these items of rented equipment appear to be insignificant. Moreover, there is no reason to believe that there was any increase in outside rentals due to the “floors first” directive; these rentals would have occurred even if the sequence of construction had not been changed.
Plaintiffs do not attack the Commissioner’s figures if depreciation is to be the standard. Those figures are based on figures appearing in defendant’s pretrial memorandum, which originally came from the plaintiffs’ own books and records.

 The name of this company was changed to Turnbull, Inc., after the present action was instituted.

 If the contracting officer made any findings of fact in passing upon the claim, they were not offered in evidence at the trial or included among the facts agreed upon by the parties in the pleadings or during the course of the pretrial proceedings under [former] Rule 28 [now Rules 43-45].

 If findings of fact were Incorporated in this decision, they were not offered in evidence at the trial or included among the facts agreed to by the parties in the pleadings or during the course of the pretrial proceedings under [former] Rule 28 [now Rules 43-45].

 Information concerning the second proceeding before the board is included among the facts that were agreed to in the pleadings. See paragraph 30 of the petition dated May 21, 1962, together with the attached appendix “C,” and also paragraph 30 of the answer dated October 19, 1962.

 Paragraph 31 of the petition dated May 21, 1962, together with the attached appendices “D” and “B,” and paragraph 31 of the answer dated October 19, 1962, furnish detailed information relative to the proceeding before the ASBCA.

 The subcontract also covered lightning protection for the buildings at an additional price of $10,300.