**UNITED CONTRACTORS, A Co-Partnership Consisting of James E. Ward, Elkin Morris and Andrew J. Dickies**

**v.**

**The UNITED STATES.**

**No. 42–63.**

United States Court of Claims.

Oct. 14, 1966.

Lyle L. Iversen, Seattle, Wash., attorney of record, for plaintiff. Lycette, Diamond & Sylvester, Seattle, Wash., of counsel.

Isaac D. Benkin, Washington, D. C., with whom was Asst. Atty. Gen., John W. Douglas, for defendant. James F. Merow, Washington, D. C., of counsel.

Before COWEN, Chief Judge, REED, Justice (Ret.), sitting by designation, LARAMORE, DAVIS and COLLINS, Judges.

## OPINION

DAVIS, Judge.[*]

On August 13, 1953, the Corps of Engineers awarded plaintiff, United Contractors, a contract to build outside utilities at Eielson Air Force Base, Alaska, at a price of $738,382.50. The agreement called for construction below ground of over a mile of concrete tunnels ("utilidors") with heights and widths varying between two and six feet. The depth of the tunnel excavation ranged from five and one-half feet to nine feet. The utilidors were to be built by pouring reinforced concrete into pre-set forms on the sides and floor of the excavation. Inside the utilidors, the contractor was to install water supply pipes, steam pipes, steam return pipes, and sewer lines which connected with existing facilities at the Base. When this was done, the concrete-lined trench was to be covered with pre-molded concrete lids and with earth to ground level. The major portion of the project was to be ready by December 1, 1953, and the entire contract was to be completed by June 1, 1954. The work was finished on schedule and accepted.

During performance, United encountered a number of obstacles which greatly swelled the cost of completing the project. The most troublesome was a condition of underground water which hindered the progress of excavation, and which, plaintiff alleges, amounted to a changed condition. United also says that it was hampered by a variety of lesser, unexpected hurdles. As a result of these difficulties, plaintiff submitted thirty claims to the contracting officer totaling $404,702.26. He decided that the contractor was entitled to be reimbursed in part, and modified the contract (by a "Change Order" dated May 29, 1954), increasing the price by $136,652.70. On April 15, 1957, plaintiff appealed to the Corps of Engineers Board of Contract Appeals which, after a full hearing, denied some of the contractor's claims, allowed others in stated amounts, and granted still others in principle but remanded them to the contracting officer for determination of the amount due. United again appealed, this time to the Armed Services Board of Contract Appeals which (on February 28, 1962) allowed some counts and denied others. The Board held plaintiff entitled to $10,194.60, which the Engineers Board had earlier awarded (on items not presented to the ASBCA), and a further sum of $42,270.19. 1962 BCA ¶ 3314. This amount ($52,464.79) has been paid. On February 14, 1963, the present suit was filed, seeking recovery of an additional $230,155.91 on the ground that aspects of the ASBCA decision are erroneous under the Wunderlich Act standards (41 U.S.C. §§ 321, 322).

---

[*] This opinion contains all necessary findings of fact. The court acknowledges the helpfulness of the recommended opinion prepared, at its direction, by Trial Commissioner C. Murray Bernhardt.

The case has been presented solely on the administrative record.[1] Our trial commissioner instructed plaintiff to file an "Assignment of Errors" pointing out specifically the errors which, in its view, the Armed Services Board committed and citing the portions of the record on which this position rests. This method of proceeding was implicitly approved in H. R. Henderson & Co. v. United States, 169 Ct.Cl. 228, 231–35 (1965), and more explicitly sanctioned in Norfolk Dredging Co. v. United States, 360 F.2d 619, 620 & n. 1, 175 Ct.Cl. ——, —— (1966). Plaintiff's assignment specified eleven alleged defects in the ASBCA decision; defendant responded issue by issue. The trial commissioner then filed a recommended opinion, rejecting some of plaintiff's claims and granting others. Both parties challenge one or another of these conclusions.

We discuss, in Part I, infra, the Government's defense that the entire claim is barred by the statute of limitations. Part II treats United's primary contention—that the Armed Services Board erred in not finding that plaintiff met changed subsurface water conditions. Part III deals *seriatim* with plaintiff's ten specific claims for reimbursement.

## I

## THE STATUTE OF LIMITATIONS

The work was completed and accepted in June 1954. Suit was begun on February 14, 1963, more than six years after the completion date. Although the defendant did not argue in its brief that the entire claim was therefore barred by limitations (and in fact confessed judgment on one item—Claim 2 in Part III, infra), it did raise that over-all defense at oral argument—after it had clarified its general position on the statute of limitations for contract cases, in connection with the presentation of Nager Elec. Co. v. United States, Ct.Cl., 368 F.2d 847, 851, and we consider the argument.

In Nager Elec. Co. v. United States, Ct.Cl., 368 F.2d 847, decided today, we reject the position that a contract claim is necessarily barred by 28 U.S.C. § 2501 if suit is not brought within six years after completion and acceptance. We adhere, instead, to the consistent view of this court that, where an administrative remedy is required by the contract, such as the "disputes" process culminating in an appeal to the Armed Services Board of Contract Appeals, the statute of limitations does not run until the determination of the designated administrative agency. In this case the decision of the Armed Services Board of Contract Appeals was handed down on February 28, 1962, less than a year before the petition was filed here. The suit is therefore timely.

We do not have in the present case any item (or sub-claim) which is not "under the contract" (within the meaning of United States v. Utah Constr. & Mining Co., 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966)) but is solely a "breach claim" outside of the authority of the ASBCA. Each of the ten specific claims now before us (see Part III, infra) was considered and determined by the Board of Contract Appeals, under one or another contract adjustment provision giving redress to the contractor (e. g., Changed Conditions clause; Changes clause; Suspension of Work clause). In each instance the Board acted within its jurisdiction to determine the controversy and to grant monetary relief if warranted. But even if we were to deem some of the items to be "breach claims", we would nevertheless hold, under the *Nager Electric Co.* decision, that no part of the single cause of action un-

---

1. The trial on the merits was held before the Board of Contract Appeals of the Corps of Engineers in Seattle, Washington, July 9, 1957. Pursuant to an agreement between the parties, the case was submitted to the Armed Services Board of Contract Appeals on the record made before the Engineers Board, except that certain supplementary testimony (relating solely to plaintiff's accounting for damages) was introduced before the ASBCA.

der this indivisible contract was time-barred when suit was filed on February 14, 1963.

■ If the proper rule is that the cause of action accrued on completion of the work in June 1954, but that limitations was tolled during the administrative consideration of plaintiff's claims (see the dissenting opinion of Judge Anderson in Crown Coat Front Co. v. United States, 363 F.2d 407 (C.A. 2, decided June 22, 1966); and the opinion of the Third Circuit in Northern Metal Co. v. United States, 350 F.2d 833 (1965)), this suit would still be timely as to all items. Some 8 years and 8 months elapsed between completion and the filing of the petition in this court. Far more than 2 years and 8 months was utilized in pursuing the administrative process through the contracting officer, the Corps of Engineers Board of Contract Appeals, and the Armed Services Board of Contract Appeals. The original claim to the contracting officer was made in June 1954; he gave his final decision in April 1957, and appeal was taken in that month to the Engineers Board. That tribunal decided in July 1959, and a timely appeal was taken to the ASBCA, which handed down its decision in February 1962. See 1962 BCA ¶ 3314, pp. 17,060–17,061.

## II

### SUBSURFACE WATER

Plaintiff first charges that the ASBCA's failure to hold that the subsurface water encountered in excavating was a changed condition within contract Article 4 (the Standard Form "Changed Conditions" clause) was legally wrong and unsupported by substantial evidence.[2]

Article 4 enables the contractor to obtain an equitable adjustment in price if it encounters "during the progress of the work [1] subsurface and/or latent physical conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or [2] unknown physical conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering * * * " in the type of work being done.

Since the actual conditions must differ "materially" from those expected, the initial inquiry is whether United ran into significant amounts of water in excavating. If no such factual findings has been or can be made, plaintiff's case fails at the outset. If, on the other hand, the contractor did discover a great deal of water, Article 4 poses additional questions: whether there were contract representations (or other factors) which could cause plaintiff to believe that the project area would be less wet; and, if so, whether the conditions encountered could not have reasonably been anticipated from a study of the entire contract, from the nature of the terrain, or from United's prior experience at Eielson.

■ On the preliminary factual issue of whether there was a large amount of subsurface water, we are bound by the finding of the Armed Services Board that "it is readily apparent" that plaintiff "did encounter large quantities of underground water during excavation." 1962 BCA ¶ 3314 at 17,065. This conclusion is well-documented; its evidentiary basis is virtually uncontradicted. The primary proof was the testimony of United's three partners, who actively conducted the business, and of the excavation sub-contractor, as well as various documents (e. g., daily reports of Corps of Engineers inspectors who kept track of the progress of plaintiff's work) indicating the extent of pumping required to rid the work area of water. This evidence shows, among other things, that United's employees often labored in two or three feet of water; that the water caused the sides of the excavation to cave in, creating additional work; that plaintiff had to dig sumps from which water could be pumped; and that water, held back by small

2. This Assignment is the principal basis for plaintiff's specific claims #1, #4, and #9, discussed, infra, Part III.

dykes, flooded large areas (three-fourths of a mile or a mile long and one-fourth of a mile wide) adjoining the utilidor trench. The daily reports also indicate that, over a several months period, plaintiff had to employ numerous pumps (at least 11) and either two or four pump-tending laborers 24 hours a day to eliminate water. The clear weight of the evidence supports the Board in this respect.[3] Indeed, officials of the Corps of Engineers agreed (at the Board trial) that United ran into a lot of water, and faced difficulties of this type.

The central issue disputed by the parties concerns the reasonableness of the contractor's expectations. Did the plaintiff anticipate or have the right to anticipate that the underground conditions would be otherwise? Plaintiff contends that the strong impression conveyed by the contract, as a whole, was that subsurface water would not be a problem; defendant's view is that burdensome amounts of water normally accompanied excavation at Eielson, and that United knew (or should have known) this. The defense has rested principally on that ground. The Armed Services Board recognized this, noting that "the Government's testimony was directed primarily to support the contention that appellant [plaintiff] should have anticipated the volume of water encountered." 1962 BCA at 17,064.

■■ The Changed Conditions clause provides, in the disjunctive, two separate bases for the reimbursement of unantici-pated costs. The first alternative allows recovery if the contractor discovers "subsurface conditions" "materially differing from those shown on the drawings or indicated in the specifications". This clause cannot be invoked if the plans and specifications do not "show" or "indicate" anything about the alleged unforeseen condition, i. e., if they say "nothing one way or the other about subsurface water". Ragonese v. United States, 120 F.Supp. 768, 769, 128 Ct.Cl. 156, 159 (1954).[4] If the contract is truly silent about subsurface water, there obviously can be nothing "shown on the drawings or indicated in the specifications" from which the actual water conditions can "materially" differ. But United claims that the "plans furnished bidders not only failed to indicate the unusually high water table, *but showed the water table to be at or below grade."* The defendant, on the contrary, suggests that there was no information in the plans or specifications, relating to the water level, on which United could properly rely as showing lesser water than was actually met. Our conclusion is that the drawings, properly viewed, did speak "one way * * * about subsurface water". Some portions "indicated", in the language of Article 4, that no unusual water conditions existed in the vicinity of the utilidor trench, and there was nothing in the other contractual papers or in the plaintiff's prior experience to put it on notice that the drawings should not be relied upon.

---

3. The evidence is adequately and accurately related in the ASBCA opinion. 1962 BCA ¶ 3314, pp. 17,063–065. Only one point is worth noting specially. Defendant's Project Engineer testified that the fact that plaintiff opened up most of the length of the utilidor trench at one time was a prime factor making it difficult to handle the water encountered. The contract did not, however, limit the distance that the trench excavation could get ahead of the utilidor-form placement. Moreover, the excavation subcontractor testified that, while his "original intention was to open up all the ditch and get out of there", he changed his whole operation due to the water, and decreased the rate of trench digging so as to minimize sloughage and reworking. The ASBCA did not find, and, on the sparse evidence in the record we think it could not find, that plaintiff's method and technique of doing the work was a material cause contributing to the presence of excessive water. The testimony of the Project Engineer is, therefore, no bar to relief.

4. The Government has an affirmative duty to furnish contractors with information only in a limited class of situations. See, e. g., Helene Curtis Industries, Inc. v. United States, 312 F.2d 774, 777–778, 160 Ct.Cl. 437, 443–444 (1963); Leal v. United States, 276 F.2d 378, 383, 149 Ct.Cl. 451, 459–460 (1960).

■ Three parts of the contract are mentioned by the Armed Services Board as "bear[ing] on the question of subsurface water". These were: the test borings in the drawings; a clause warning that "a condition of high ground water exists in this [work] area"; and sketches of certain physical features of the job-site. Plaintiff stands squarely on the claimed material difference between the actual conditions and those the borings depicted. We examine this contention first, isolated from the other two relevant items.[5] The profiles of the test borings are particularly important, for purposes of Article 4, because they were expressly included in the plans as a specific description of subsurface conditions at the utilidor site. The significance of such drawings (or profiles) of borings has been confirmed by our opinions. See, e. g., Ragonese v. United States, supra, 120 F.Supp. at 770, 128 Ct. Cl. at 161, 162; Leal v. United States, supra, 276 F.2d at 383, 149 Ct.Cl. at 459–460.

■ Carefully read, the profiles in this contract indicated that water would not be encountered in meaningful amounts in excavating for the project. The Board stated that they "gave appellant [plaintiff] practically no advance indication that such a condition would be found. Since the condition existed it is difficult to understand why the borings failed to reveal it." And, more categorically, the Board continued, "the fact is that if appellant [plaintiff] had no other source of information than the borings it could well have been misled." 1962 BCA at 17,065. We agree that the borings, considered alone, plainly created an erroneous impression. The "General Plans" given to United said nothing about water. But seven large sheets of drawings (captioned "Outside Utilities Eielson Air Force Base") showed profiles of utilidors and of the cores of borings. Some utilidors on these drawings were marked "not a part of this [plaintiff's] contract", though all were located in the same general zone at the Base. About forty borings were shown on the drawings. Two of the seven sheets clearly depicted the results of thirteen borings made along the course of United's utilidor trench, and none showed a condition of subsurface water. Only three of these thirteen borings went to or below the bottom level of the excavation, but some of the others went more than three-fourths of the way down. Moreover, many of the other twenty-seven borings, pertaining to utilidors not being built under this contract, went below the bottom level of the trench, and only a couple indicated water at depths to which United had to dig. If plaintiff had any doubt about the reliability of the borings connected with its own contract (because only three were shown as going to the bottom), it could properly look to this related source of information. Business sense and human nature would tell contractors not to shut their eyes to relevant data of this type. "[C]ontractors are business men, and in the business of bidding on Government contracts they are usually pressed for time and are consciously seeking to underbid a number of competitors." Blount Bros. Constr. Co. v. United States, supra, 346 F.2d at 972–973, 171 Ct.Cl. at ——. United could reasonably look at all the borings furnished by the Government, including those outside its particular project area; and the import of the bor-

---

5. Under the Wunderlich Act, we are wholly free to differ from the Board in reading the contract papers. Insofar as the Board's decision was "concerned with an analysis of the contract specifications and drawings", the questions are of law and therefore for independent determination by the court. "Simply because an 'equitable adjustment' is involved does not automatically project the case into the category of that kind of contract dispute to which administrative finality attaches." Kaiser Industries Corp. v. United States, 340 F.2d 322, 333, 169 Ct.Cl. 310, 330 (1965). To the extent the ultimate determination of liability "turns on the proper interpretation of contract provisions", this court is not restricted by the Board's analysis. Id., 340 F.2d at 334, 169 Ct.Cl. at 331, Blount Bros. Constr. Co. v. United States, 346 F.2d 962, 964, 171 Ct.Cl. ——, —— (1965).

ings was that undue amounts of water would not be met in excavation.

It is not an obstacle, as the Government suggests, that the borings could have been unrepresentative because they were made some thirteen months before plaintiff began working. There was some testimony that the elevation of the ground water table depended on a number of factors, and could vary from month to month or from season to season. Plaintiff's officials knew that the borings had been made in June and July of the year preceding the award of the contract (in August 1953). But they felt that this was the "same time" of the year, and therefore that the accuracy of the borings would not be affected. On this reasonable predicate, the lag between the test boring and the excavation was only one or two months. Generally, there will be a lapse between the boring period and the date the contractor commences work; it takes time to analyze the samples recovered, to translate the gathered information to drawings, and to let the contract. Borings are nevertheless considered the most reliable reflection of subsurface conditions. To hold plaintiff barred because the water level might vary from month to month would be to preclude contractors from ever relying on borings made in circumstances like those at Eielson. The parties could not have intended that result. They apparently did not consider that borings made in June or July would be misleading to a person excavating in August, for the Corps of Engineers included them in the contract, and the plaintiff relied on them without taking exception. Both acted on the assumption that, while subsurface conditions might vary from season to season (from spring to summer), they would be roughly equivalent in the same season —from one summer to the next.

Thus, if the profiles stood alone, everyone would have had to conclude, we think, both that plaintiff had good cause to believe that it would not have to excavate in excessive water, and that the conditions actually encountered in performance differed materially from those represented by the defendant. Without more, the contractor had every right to take at face value the information communicated by the profile drawings.[6]

The next problem is whether anything else in the contract documents barred plaintiff from concluding from the borings that, generally, relatively dry earth would be encountered. Cf. Flippin Materials Co. v. United States, 312 F.2d 408, 413–415, 160 Ct.Cl. 357, 365–367 (1963). We think not. The boring profiles were the one contract item explicitly treating with subsurface conditions in detail, and Technical Provision 1–07 ("Subsurface Investigations") explained the background and purpose of the borings, in effect inviting their consideration in the preparation of bids. It stated that "explorations consisting of drill holes and/or test pits have been made at the site of the project. The locations and soil logs of the explorations are shown on the contract drawings *to assist the Contractor in ascertaining the character of the excavation material* to be encountered" (emphasis added). Under this provision, plaintiff's failure to consider the profiles (had they

6. We note, in this connection, that a finding that the contractor was actively "misled", in the sense that the Government "withheld" or "concealed" information within its grasp, is not essential to proof of a changed condition. The first portion of Article 4 requires only that the actual conditions "materially differ" from those shown or indicated on the plans or specifications. Fault on the part of the Government is not a necessary element. Our decisions have recognized and given effect to this distinction. Cf. Rainieri v. United States, 96 Ct.Cl. 494, 506 (1942), cert. denied, 317 U.S. 690, 63 S.Ct. 264, 87 L.Ed. 552; Ragonese v. United States, supra, 120 F. Supp. at 768, 770, 128 Ct.Cl. at 158–159, 160–162; General Casualty Co. v. United States, 127 F.Supp. 805, 809, 812, 130 Ct.Cl. 520, 527–528, 532 (1955), cert. denied, 349 U.S. 938, 75 S.Ct. 783, 99 L.Ed. 1266; Leal v. United States, supra, 276 F.2d at 383, 384–385, 149 Ct.Cl. at 459–460, 462; Kaiser Industries Corp. v. United States, supra, 340 F.2d at 330–331, 169 Ct.Cl. at 325–326.

shown water) would most likely have been neglect. It would be illogical now to fault United for having relied on them.

 It is true that Provision 1–07 also provided that "the Government does not guarantee that materials other than those disclosed by the explorations will not be encountered, or that the proportions of the various materials will not vary from those indicated by the logs of the explorations." But we have held, in comparable circumstances, that broad exculpatory clauses (identical in effect with this one) cannot be given their full literal reach, and "do not relieve the defendant of liability for changed conditions as the broad language thereof would seem to indicate." *Fehlhaber Corp. v. United States*, 151 F.Supp. 817, 825, 138 Ct.Cl. 571, 584 (1957), cert. denied, 355 U.S. 877, 78 S.Ct. 141, 2 L.Ed. 2d 108. As *Fehlhaber* said, general portions of the specifications should not lightly be read to override the Changed Conditions clause. Ibid. It takes clear and unambiguous language to do that, for "the provision sought to be eliminated, or subordinated, is a standard mandatory clause of broad application * * *." *Thompson Ramo Wooldridge Inc. v. United States*, 361 F.2d 222, 228, 175 Ct.Cl. ——, —— (1966).

 The ASBCA's conclusion that "the plans and specifications", as a whole,[7] "did in fact give adequate advance indication to appellant [plaintiff] of the likelihood that subsurface water would be encountered," was based primarily on its interpretation of two other contract items which did warn of water. One was a clause (under the heading, "Ground Water") cautioning that "a condition of high ground water exists in this area"; the other was the showing in the drawings of pools and water ditches. In our view, these two warnings, vaguely suggesting the presence of water, were not adequate to impel plaintiff to anticipate the particular difficulty it had. Their low-key message was muffled by the specific information on subsurface water furnished by the profile drawings, coupled with Technical Provision 1–07's invitation to use the profiles to "assist * * * in ascertaining the character of the excavation material." The question is close. But, as the Board recognized, the "significance" of the "high ground water" warning "is not enlarged upon in the evidence" or in technical works. 1962 BCA at 17,065. What it would connote to a contractor is most uncertain. To us it appears to be an indefinite caveat without precise content. "High ground water" is obviously a relative term, and the borings had shown no substantial water to be foreseen in excavating. The mere statement that a condition of high ground water exists is fully consistent with the presence of water just below the bottom depth of the utilidor excavation and with United's prior experience—to be discussed infra— in which only insubstantial amounts of water were found on excavation. The most reliable and most specific indicator—the borings—had shown that water would not interfere with excavation. We cannot agree that this precise information was negated by the undefined and unexplained generality of the "high ground water" clause. For comparable reasons, the reliability of the drawings of a pond and water ditches—surface waters—as an indication of underground conditions is also very questionable. See *Ragonese v. United States*, supra, 120 F. Supp. at 769, 128 Ct.Cl. at 160, 193–194. Contrary to the Board, we are not ready to give either item the necessary weight to counterbalance the borings.[8]

---

7. As we have pointed out, the ASBCA thought that the profile drawings, standing alone, did not conform to the actual conditions.

8. In contrast, the misinformation supplied by the Government's drawings in Jefferson Constr. Co. v. United States, 364 F. 2d 420, 176 Ct.Cl. ——, (July 1966), was more than neutralized by a very specific contract clause which could not be harmonized with the contractor's view of the drawings. The same was true, *mutatis mutandis*, in Construction Service Co. v. United States, 357 F.2d 973, 174 Ct.Cl. —— (1966), and Randolph

Nor can we accept the Board's alternative conclusion that plaintiff must have anticipated water because it had "previous construction experience in the area", and, "if water was found in the quantity which appellant [plaintiff] alleges, it must have been present in prior, recent construction." 1962 BCA at 17,065. This thesis is simply unsupported by substantial evidence. On a prior contract, plaintiff had found water, but it was eliminated with an inch and a half pump in a few hours. At the start of this work, plaintiff owned only that one pump. When it encountered water, it had to purchase at least seven pumps (all but one being three or four inches in size) and lease nine others (ranging in size from three to eight inches). Plaintiff's partners all testified, in substance, that their "prior experience did not show" that they should "expect to meet water at levels this contract called for" digging. They admitted they had found water before, but only in inconsequential amounts. The Government's Project Engineer testified that the water plaintiff dealt with on another job "did not amount to much", and that he did not expect water on this contract. The Government's other principal witness (whose testimony is the major basis for the view that plaintiff should have anticipated water) admitted that he did not *know* that plaintiff had excavated in water before, but that he *thought* plaintiff had. The Board's opinion merely speculates that water "must have been" present before. On this aspect of the dispute, then, we are required to reject the Board's factual finding, and we conclude instead that the record compels the finding that, in its prior experience, United had never encountered subsurface water in quantities at all comparable to those discovered under this contract.

We hold, therefore, that plaintiff did not expect or have reasonable cause to anticipate, from information either within or without the confines of its agreement, that it would encounter underground conditions like those experienced. "The very purpose of Article 4 is to prevent bidders from adding high contingency factors to protect themselves against unusual conditions discovered while excavating, for obviously no one can ever know with certainty what will be found during subsurface operations. The article is thus expressly designed to take at least some of the gamble out of subsurface operations." Kaiser Industries Corp. v. United States, supra, 340 F. 2d at 329, 169 Ct.Cl. at 323. Its object is to persuade contractors to calculate bids on the basis of the description contained in the specifications, plans, and drawings (including the borings). That rationale is served by allowing United to recover an equitable adjustment because it had to deal with unanticipated amounts of subsurface water.

### III

### SPECIFIC CLAIMS

*Claim 1—"Excavation for Outside Utilities"*—Plaintiff seeks to recover extra expenses incurred in excavating for outside utilities. The amount stated in the contract for this item was $60,000, calculated on a unit price of $3.00 per cubic yard and an estimated quantity of 20,000 cubic yards. In its demand to the contracting officer, United asserted (i) that the actual quantity excavated was 27,876 cubic yards and (ii) that, because of various improper acts of the Government, the average cost of all the excavation was increased to $4.50 per cubic yard. The amount sought was $125,-442.00. The contracting officer found that "the total excavation" was 25,077

Eng'r Co. v. United States, 367 F.2d 425, 176 Ct.Cl. —— (July 1966). Similarly in Flippin Materials Co. v. United States, supra, 312 F.2d 408, 160 Ct.Cl. 357, the inaccuracy of the borings was indisputably corrected by the field logs which the contractor failed to examine.

In Banks Constr. Co. v. United States, 364 F.2d 357, 176 Ct.Cl. —— (July 1966), there were no misrepresentations by the Government, and it was found that the contractor should have anticipated the ground conditions it encountered.

cubic yards (or 5,077 more than the estimate). He held that plaintiff should be paid for this additional quantity at the price of $3.00 stated in the contract. On this basis, contract modification number 5 raised plaintiff's compensation $15,231.00. In addition, a lump sum of $14,921.65 was allowed as an equitable adjustment for certain expenses not normally encountered in excavation, even though plaintiff never specifically claimed, in terms, an award of this type. This increment covered, for example, costs relating to removal of unforeseen obstructions, such as a buried fuel line and sewer line. The total allotted for excavation was $90,152.65. As discussed in Part II, supra, no award was made for excavation expenses arising from changed subsurface water conditions. The ASBCA reviewed these conclusions, and affirmed them.

 Plaintiff disputes the administrative findings as to the quantity of excavation and the price allowed for that work. We affirm the Board on the first question, and disagree with its treatment of the second. The evidence showed two different computations of quantity. Apparently both were prepared by individuals well-qualified and competent to make estimates of this type. The one supporting plaintiff's claim totalled 27,876 cubic yards. A second computation, accepted by the Board, indicated 25,077 cubic yards of excavation. This latter figure was based on a study of the contract drawings and a survey of the job site by a surveyor-contractor (retained by plaintiff's excavating subcontractor) and a member of the Resident Engineer's Office at Ladd Air Force Base. These two men adequately considered the various factors affecting a determination of the quantity of material excavated, and their estimate appears fair and accurate. While the contractor's computation is at odds with this estimate, plaintiff has pointed to no fatal flaw in the conduct of the survey or in the conclusion. In these circumstances, the administrative election to adopt one computation, rather than another, cannot be tagged as arbitrary or unreasonable. Fact-finding necessarily entails the exercise of judgment. Substantial evidence supports the Board decision that the total quantity of material excavated by the plaintiff was 25,077 cubic yards.

The question of the measure of plaintiff's recovery for excavation in excess of the contract estimate is more complex. United initially phrased its claim solely in terms of an adjustment in the unit price, and it still presses only that position. It attributed this increase (from $3.00 to $4.50 per cubic yard) to nine principal factors.[9] As we have noted, the contracting officer increased the price of excavation on several of these grounds (the failure of plans to show certain "obstructions", etc.), but he did so by awarding a lump sum (of $14,921.65), rather than by raising the unit price. It is clear, though, that this increase was rooted in the factors for which plaintiff sought an upward adjustment in the unit price. In substantial effect, the approach taken by the contractor and that of the contracting officer are identical. The single, bulk figure chosen by the latter is the sum of the unanticipated costs plaintiff incurred in excavating in the face of unforeseen obstacles. Allocation of this sum over the total yardage removed would show the unit price increase (as sought by the plaintiff). Thus, plaintiff can complain only that the amount of its recovery is inadequate, not that the contracting officer categorically denied its entire claim. If United received both the lump sum and the unit adjustment, it would recover its added costs twice. With one exception, we find the ASBCA's affirmance of the contracting officer's

9. Plaintiff's claim spelled out the nine unforeseen conditions, and enumerated eleven specific adverse "effects" these conditions had on performance. It concluded, "The foregoing conditions existing in the actual performance of the work resulted in the reasonable value on a unit basis per yard of excavation of $4.50."

action legally correct and supported by substantial evidence.

■ ·One of the factors allegedly pushing up plaintiff's excavation expenses was stated as follows:

> The plans failed to show the high water table and the contractor and bidders generally were misled as to the nature of these sub-surface conditions by borings which indicated the water table at or below the bottom of the excavation.

The contracting officer did not grant an increase in price on this ground because he found that plaintiff "was aware of existing subsurface conditions" and that the specifications adequately warned of the high ground water. His findings (dated April 27, 1955) make it plain that no sum was allowed for excavating in changed water conditions. Since our determination (Part II, supra) is the other way, United is entitled to recover an added amount—if the contract so permits. The evidence is that it costs more to exacavate wet material—such as a mixture of gravel, water, and mud— than dry, solid earth.

We hold that the contract provides in the Changed Conditions article for this relief; there is no merit to the contention that Special Condition 32 ("Estimated Quantities") fixes the unit price for excavation at $3.00, and prevents any added reimbursement. Special Condition 32 requires completion of the work at the specified unit price even when performance involves "quantities greater or less than the estimated quantities", unless "the actual quantity of work performed under any item" varies from "the estimated quantity by more than 25%." When there is a runover, it sanctions renegotiation of the unit price only for "the actual quantity of work * * * in excess of the estimated quantity plus 25% thereof." [10] The ASBCA noted this

article in denying plaintiff's claim. 1962 BCA at 17,067.

■ The clause is a ready vehicle for adjusting, with a minimum of haggling, the compensation received by contractors who are called upon in the course of performance to do, within limits, more or less work than could be estimated. But we have held that clauses of this type do not control when the cost of doing the extra work greatly differs from the stated unit-price because of factors not foreseen by either party. In that event, the Changed Conditions clause comes into play and overrides the Special Condition. Peter Kiewit Sons' Co. v. United States, 74 F.Supp. 165, 168, 109 Ct.Cl. 517, 522–523 (1947); Loftis v. United States, 76 F.Supp. 816, 825–826, 110 Ct. Cl. 551, 627–629 (1948); cf. H. L. Yoh Co. v. United States, 288 F.2d 493, 495, 153 Ct.Cl. 104, 107–108 (1961). Moreover, this is the way the present parties viewed the interconnection of the two clauses. And it is the interpretation the contracting officer (and the contract appeal boards) attached to the Changed Conditions clause when they authorized the payment to plaintiff of $14,921.65 extra for excavation, on the ground that certain changed conditions were encountered during performance.[11] Plaintiff's claim must be granted, in an amount to be determined in the first instance (if the parties cannot agree) by the Armed Services Board of Contract Appeals. United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966).

■ *Claim 2—"Classified Fill and Backfill for Outside Utilities"*—The ASBCA found that United had placed 15,486 cubic yards of fill for outside utilities, as compared with the 1,550 yards estimated in the contract, the 1,956 yards allowed by the contracting officer, and the 13,478½ yards found by the Corps

---

10. The actual quantity (25,077 cu. yards) was only 77 cu. yards "in excess of the estimated quantity [20,000 cu. yards] plus 25% thereof." The Board considered this .39% negligible and not enough to call for a renegotiated unit price.

11. The Board did not go counter to this rule in ruling on the claim for subsurface water since it held (incorrectly, as we have now determined) that there were no changed conditions in that respect.

of Engineers Board. The final Board's finding is adequately supported by the survey which we accepted as controlling on Claim 1. Under the contract (Special Condition 32, relating to "Estimated Quantities") plaintiff was entitled to be paid $3.15 per yard for the first 1,938 yards of fill (the estimated quantity plus 25%), with the unit price for any excess to be open to renegotiation. The Board so held, and the parties accept that conclusion. As to the initial 3,500 yards of the amount in excess of the contract estimate, the Board allowed $3.15 per yard, because plaintiff had incurred certain expenses in hauling it from the Government's borrow pit. We take this figure as accurate. Only $2.35 per yard was allowed for the remaining portion of the excess, 10,048 yards, because this material had been obtained from the worksite and, therefore, the cost of hauling was not incurred. United's present claim is confined to this 10,048 yards which it says should be paid for at the contract rate of $3.15 per cubic yard instead of the ASBCA's figure of $2.35. The only probative evidence of cost the parties have pointed to is the testimony of a Government witness who estimated that plaintiff saved roughly 50 cents per cubic yard by obtaining this final batch of fill from the worksite, rather than the borrow pits. Thus, we find the Board decision fixing $2.35 per cubic yard as the unit price for payment of the additional 10,048 cubic yards of fill arbitrary and unsupported by substantial evidence. Instead, the plaintiff is entitled to $2.65 per cubic yard ($3.15 minus 50 cents), or $3,014.40.[12]

*Claim 3—"Laterals to the Butler Buildings".*[13]—Plaintiff was required to excavate and construct utilidor lines laterally from the main utilidor to six adjacent buildings—known as the Butler Buildings. It asserts that this was not called for in the drawings and specifications and that it did not consider this work in preparing its bid. The demand is for $17,074.56 under the Changes clause.

Three parts of the drawings are directly pertinent to this claim—sheets #2, #5, and #12.[14] Sheet #2 shows six existing Butler Buildings. Sheet #5 indicates that five of the Buildings are existing, and a dotted line shows that a sixth Building is planned, though not yet in existence. Included on both sheets is a legend indicating that the work to be performed by the contractor is cross-hatched. One of plaintiff's partners testified that, in his view, the lateral lines to the Butler Buildings were not cross-hatched on sheet #2.

The main source of plaintiff's problem was the symbol "A.P.S." (in the legend on sheet #2) which the contractor says it took as referring to future work not let under its contract. The drawing identifies the symbol "A.P.S." as "Construction Required for Assigned Peacetime Strength." United asserts that since the symbol "A.P.S." appears on sheet #2 by each of the manholes in front of the Butler Buildings, and since the laterals to the Butler Buildings were not cross-hatched, it had reason to believe that any work to be done in connection with those structures would be let in the future. Defendant counters that United's interpretation of "A.P.S." is not reasonable because two other symbols (appearing immediately above the "A.P.S.") explicitly state what work was outside the scope of plaintiff's contract. One of these symbols signified "Construction By Others", and the other (the cross-hatching) designated "Utilidors and Manholes This Contract". Defendant argues also

12. Plaintiff has not excepted to the conclusion of our trial commissioner on this point, and, therefore, we do not determine the effect of Special Condition 32 (fixing the unit price at $3.15 per cubic yard, absent a demand for renegotiation) on this particular claim. Except for its defense of limitations (which we have rejected in Part I, supra), the defendant does not contest the trial commissioner's determination (which we accept) that $3,014.40 should be awarded on this claim.

13. This was Claim IV–E before the ASBCA.

14. Technically, these were drawings No. 71–10–74, plates G–K, sheets 2 and 5, and plate 1–13, sheet 12.

that many sections of the main utilidor which are cross-hatched also list the symbol "A.P.S." in parentheses after the dimensions; plaintiff acknowledged its obligation to build them, and did, in fact, construct them without complaint. The Government concludes, therefore, that "A.P.S." was obviously no more than a mark for the convenience of its engineers. Whatever the reason for the symbols, we agree that the contractor could not reasonably believe them to refer to future work not a part of its contract.

 The question is one of interpretation—and, therefore, of law—for decision by the court. See, e. g., River Constr. Corp. v. United States, 159 Ct. Cl. 254, 262 (1962); Kings Electronics Co. v. United States, 341 F.2d 632, 640–641, 169 Ct.Cl. 433, 446–447 (1965). Despite the testimony that the laterals were not cross-hatched on sheet #2, the Board concluded that the laterals were in fact so marked on that drawing. Examination of that sheet shows cross-hatching, especially when compared with sheet #5, on which the cross-hatching is plainly absent. The laterals do not appear on sheet #5 because the principal purpose of that drawing was to show the location of the water mains. This is apparent from an examination of the legend and of the drawing. On the other hand, sheet #2 was designed to show the overall plan of the utilidors, and this drawing quite properly shows all the laterals and utilidors and indicates that their construction is to be included in the price of the contract. Furthermore, a more detailed scale drawing of the Butler Buildings and laterals (sheet #12) unmistakably indicates that construction of the laterals was part of the plaintiff's contract. This drawing was entitled "Utilidors", while sheets #2 and #5 were more general and entitled "General Plan". The specific drawing is the more reliable and telling. Even though some of the testimony shows that grade and construction details were lacking in these sheets, piping details which relate specifically to the

laterals were included in some drawings (such as #34). Also, some specifications relating to the laterals appear on both sheet #2 and sheet #12. For these reasons, plaintiff's interpretation must be rejected as plainly wrong. The claim is denied.

 *Claim 4—"Dewatering costs"* [15] —Plaintiff claims $64,868.30 more than the $23,804.64 allowed by the contracting officer (and the Board) for expenses of dewatering the excavation site with pumping equipment. The partial award was based on the use of pumps for 14 days longer than would have been the case had plaintiff not encountered underground obstructions (e. g., the gas and sewer lines not shown on the plans). As mentioned under claim 1, supra, the Government has admitted responsibility for the 14 day delay, but the balance of this dewatering claim was disallowed administratively because it was held to be the consequence of high ground water conditions which plaintiff should have anticipated. Because we have reversed that conclusion and hold that the underground circumstances were a changed condition within Article 4, plaintiff is entitled to recover an additional amount for dewatering. The Armed Services Board will have to make the determination in the first instance (if the parties do not stipulate).

 *Claim 5—"Cost of Building a Trestle to Carry the Alaska Railroad"* [16] —Plaintiff asks $4,862.12 as the cost of building a trestle to carry the track of the Alaska Railroad (owned by the Government) where the utilidor passed under the rail line. It says that nothing in the contract or specifications called for such a trestle, and that requiring it to be built was a "change" under the Changes article. The framework for deciding this dispute is furnished by Special Condition 18 ("Protection of Existing Structures, Utilities And Work"). It provided that "the contractor shall protect all existing structures, utilities and work that are [1] shown on the drawings or [2] the

---

15. This was Claim V before the ASBCA.

16. This was Claim VI before the ASBCA.

location of which is made known to the Contractor prior to excavating, * * * against damages or interruption of service which may result from operations of the Contractor. Damage or interruption of service resulting from failure so to do shall be repaired or restored promptly by or at the expense of the Contractor." We think the Alaska Railroad track is an existing "structure" or "utility" within this provision. In addition, the plans and drawings clearly showed that the utilidor had to traverse various railroad tracks, including this one. That alone would be enough to require the contractor to bear the cost of getting the utilidor past the track without interrupting service. Moreover, one of plaintiff's partners testified that he knew that Alaska Railroad equipment ran over these tracks, and the Project Engineer said that it was common knowledge among contractors that the Railroad operated continually, bringing a variety of items to Eielson Air Force Base, including both gasoline needed for Air Force jets and contractors' building supplies. Contract Special Condition 16, describing the means of transportation available for use in performing plaintiff's contract, noted that the "jobsite is served by commercial rail". This evidence supports the Board's conclusion that plaintiff was not "entitled to assume that the Alaska Railroad line could be closed and traffic interrupted." 1962 BCA at 17,071. The Board's denial of plaintiff's claim cannot be overturned either as unsupported by the evidence or as legally erroneous.

■ *Claim 6—"Cost of Heating Forms During Winter Work"* [17]—This claim is for an equitable adjustment, under the suspension of work article, based on alleged interference due to changes in plans and other Government-induced delays. Under the plaintiff's original progress plan, the utilidor was scheduled to be 30% complete by October 1, 1953, 70% by November 1, and 95% by December 1. In actual performance, it was 63% complete by October 1, 91% by November 1, and 92% by December 1. United thus surpassed its own expectations. It says, however, that the Government's improper actions required it to extend its work into the cold weather seasons, and deprived it of the benefit (cost savings) of its advanced position in getting the job done earlier than scheduled. It originally sought $18,956.41 for heating costs (for the period October 3 to December 12) relating to the preparation of forms and the pouring of concrete. In Modification 5, the contracting officer allowed $9,114.06 for delays considered not United's fault. This award of 50% was a compromise based on a want of precise data as to individual items of delay-expense. Plaintiff now seeks the $9,842.35 balance which it was denied administratively.

United does not enumerate specifically the delays for which it seeks redress. In the absence of particulars, the Board (in affirming the contracting officer) assumed that the delays involved were those covered by other specific claims— i. e., those resulting from certain changes in utilidor construction; from the defendant's failure to furnish plans on time and in sufficient quantities; from the existence of sewer and gas line obstructions; from the tardy delivery of concrete; and from defendant's failure to make timely soil inspections. On the record, this approach seems sound and the parties have not excepted to it. The Board considered these claimed delays and, in most instances, found them "not unreasonable". Some were found unreasonable, and the Government admitted others to be so. After noting that it was "difficult to determine from the record" what delays caused plaintiff "to perform in bad weather work which he [sic] would have done in moderate weather", the Board made the following finding (1962 BCA at 17,073–74):

We believe that appellant would have had to do substantial utilidor construction in October and that its 63% completion figure for 1 October and its

---

17. This was Claim VII before the ASBCA.

91% completion figure for 1 November would have been only slightly higher if there had been no delays. The utilidor construction work in October would have been considerable under any circumstances; construction in November probably would have been minimal.

On the basis of all the evidence, it held the contracting officer's 50% allowance of plaintiff's claim equitable.

▇ Plaintiff has pointed to no parts of the record made before the Board to show that the agency decision falls into any of the classes stigmatized by the Wunderlich Act. In fact, plaintiff introduced little evidence in support of this claim, and the Board took great pains to analyze it in the context of the entire job.[18] In this court, plaintiff has not sustained its burden of showing that the Board's conclusion was arbitrary or unsupported. We have often held, in cases involving alleged changes or Government caused delays, that the plaintiff must single out facts or evidence showing that under the standards of the Wunderlich Act the administrative decision cannot stand. See, e. g., River Constr. Corp. v.

United States, supra, 159 Ct.Cl. at 269; H. R. Henderson & Co. v. United States, supra, 169 Ct.Cl. at 237. That is the plaintiff's burden of proof, and it has not been sustained here.[19]

▇▇ *Claim 7—"Miscellaneous Delay Claims".*[20] In this section, plaintiff lumps together a variety of claims, primarily for delay, divided into 12 categories totaling $39,416.97.[21] Each of these was the subject of a ruling by the ASBCA, presumably under the Suspension of Work article, though the Board did not so specify.[22] The Board allowed portions of the plaintiff's total claim, stating the reasons for its decision at length. As noted earlier, United was directed in this court to file an Assignment of Errors specifying the factual errors which the Board made and citing those portions of the administrative record on which it relies to demonstrate that the Board decision was erroneous.[23] Plaintiff has, however, failed to do so, and merely alleges generally a right to recover. In these circumstances the court is not required to search the record for itself. Cf. H. R. Henderson & Co. v. United States, supra, 169 Ct.Cl. at 235; Hunt & Willett, Inc. v. United States, 351

18. Plaintiff's claim is, in effect, that it could have completed in one and a half months a project which both it and the Government had anticipated would take more than twice that length of time.

19. Defendant has not argued that the Board erred in concluding that, under the Suspension of Work clause involved here, a "stop order" from the contracting officer was not required. See T. C. Bateson Constr. Co. v. United States, 319 F. 2d 135, 160, 162 Ct.Cl. 145, 187 (1963). Nor does it contend that the Board erred, under United States v. Blair, 321 U.S. 730, 64 S.Ct. 820, 88 L.Ed. 1039 (1944), in holding plaintiff entitled to recover 50% of this claim.

20. This was Claim VIII before the ASBCA.

21. The claims are identified as follows:
Changes in plans ............ $3,339.48
Grade change in hangar area .. 803.52
Failure to instruct re gas
 line obstruction ............ 657.00

Delay south of Manhole 224–
 3 ...................... 1,466.67
Soil inspection delay re concrete pouring ............. 3,927.69
Soil inspection delay in refrigerated area ........... 4,721.37
Soil inspection delay, general ..................... 4,940.83
Overexcavation delay, ditches .. 4,214.00
Overexcavation delay, MH
 188–B ................... 1,292.29
Concrete pour stoppage ...... 197.88
Removal of shack ........... 85.04
Lack of plans .............. 13,771.20
 39,416.97

22. See footnote 19, supra.

23. The Commissioner's letter of March 2, 1964 directed United "to file an Assignment of Errors, *pointing out specifically* the factual errors which were made in the administrative decisions, and *citing those parts* of the administrative record upon which the plaintiff relies to demonstrate a lack of substantial evidence or the other Wunderlich criteria." [Emphasis added.]

F.2d 980, 983, 168 Ct.Cl. 256, 260–261 (1964). We have studied the parties' submissions and the parts of the record cited by defendant. Our conclusion is that United has not shown that the Board's decision lacks substantial support.

■■ In addition, there is no merit to the plaintiff's contention that the Board erred when it found that the Government was responsible for delaying United, but, nevertheless, refused to award plaintiff the full amount of its claimed costs. The Government is responsible only for damages *proved* to be attributable to its delays. See, e. g., River Constr. Corp. v. United States, supra, 159 Ct.Cl. at 259, 270–271; Specialty Assembling & Packing Co. v. United States, 355 F.2d 554, 564, 174 Ct.Cl. ——, —— (1966). The Board reimbursed plaintiff to the extent that it incurred expenses which, absent the Government-caused delays, would have been avoided. On this record, United is entitled only to that much.

*Claim 8—"Failure to Deliver Concrete"* [24]—United seeks $9,688.99 for costs allegedly resulting from three factors: (i) the failure of the Government to deliver concrete on October 1 and 2; (ii) the Government's delay in delivering concrete on October 3; and (iii) certain activities (mainly dewatering and heating on October 4) in connection with maintaining utilidor forms in preparation for pouring concrete. The argument is that the contract required defendant to furnish concrete on the contractor's order; that plaintiff scheduled large pours of concrete for the first three days of October; that these pours were at a critical time of the year because the weather was then beginning to become particularly unfavorable; and that the Government failed to supply concrete as requested. The expenses claimed are mainly for crew stand-by time and overtime labor. The Board awarded plaintiff some $3,000.00 as an equitable adjustment covering part of October 1 and 2.

The concrete to be poured under the contract was Government-furnished property. Paragraph f of Special Condition 5 ("Government-Furnished Concrete, Concrete Materials, and Pit-Run Material") provided that costs attributable to either of three enumerated causes "shall be a matter of adjustment among the Contracting Officer, the Contractor, and the Concrete Supply Contractor, and shall not constitute a claim for an extra * * *." The three listed causes were (1) "beginning, rapidity, or continuity, of deliveries of batches"; (2) "failure of delivery by the concrete supplier due to breakdown of his equipment"; and (3) "placement consistency of delivered concrete". Moreover, the Government-furnished Property clause stated that the Government shall deliver property as required (i. e., concrete when ordered), and that when there is a "delay or failure" to deliver such property an "equitable adjustment shall be made in the * * * price * * *."

■■ First, as to the failure of the Government to deliver concrete on October 1 and 2. Plaintiff had requested 200 cubic yards of concrete on both those days. The concrete supplier's plant was not in operation because of lack of steam, which it received from Eielson Air Force Base. The Government shut the steam off temporarily to allow another contractor to work on a utilidor. The Board held that this claim was not a matter for adjustment under Special Condition 5, paragraph f, because that provision is "designed to protect the Government for delays caused by the cement supplier." 1962 BCA at 17,081. It found that "failure of delivery by the cement supplier due to breakdown of equipment is substantially dissimilar from a failure of delivery due to actions of the Government incapacitating the cement plant." We agree. The Board also held that under the Government-furnished property clause the plaintiff was entitled to an equitable adjustment. It allowed $3,577.71 (about one-third of the total claimed).

---

24. This was Claim IX before the ASBCA.

This was an estimate based on various factors which the Board spelled out in detail in its opinion. Plaintiff has cited no portions of the record to challenge this estimate. Our trial commissioner found that the Board's estimate was reasonable, and neither party has excepted to that holding. We therefore deny plaintiff's claim, and affirm the Board.

■ The second item of expense is for the Government's delay in delivering concrete on October 3. On that day, United requested delivery of 300 cubic yards of concrete between 8 a. m. and 9 a. m. It says the concrete was not delivered until 10 a. m. (which delayed all its work for one-fourth of a day); it seeks $1,422.45 as compensation for the loss of one-fourth of a day's labor expenses. The Board held that Special Condition 5, paragraph f(1), precluded recovery. That section, as pointed out above, shields the Government from liability due to the concrete supplier's delay in delivering concrete. It excuses the Government for delays resulting from the "beginning, rapidity, or continuity of deliveries" as well as from any "similar causes". This broad language certainly covers late deliveries like that complained of here. Plaintiff has not produced anything to show that the Board's interpretation was wrong. This claim is therefore denied.

■ Lastly, United seeks to recover for maintenance operations on Sunday, October 4. It asserts that virtually its entire force was on duty maintaining approximately 700 feet of forms in the utilidor and lateral trenches waiting for the delivery of concrete which did not arrive, although it had been ordered on October 3. Plaintiff apparently intended to accomplish on October 4 the concrete pouring that it was prevented from accomplishing on October 1 and 2 due to delivery failures on the earlier dates. Special Condition 5(d) required the contractor to give "advance notice" to the concrete suppliers of its "concrete requirements for any twenty-four (24) hour period" at least "forty-eight (48) hours prior to the scheduled placement." Plaintiff wrote to the Resident Engineer, Corps of Engineers, on October 3 complaining of the failure of delivery on October 1 and 2, and requesting "that the Government furnish the contractor concrete on Sunday, October 4, 1953, at no expense to the contractor * * *." The report of the Chief, Concrete Branch, states that "No formal request for concrete delivery on 4 October 1953, was made to the Supply Contractor." Plaintiff has pointed to nothing either to indicate that the requirement of 48 hours advance notice to the concrete supplier was waived or inapplicable, or to show that it did comply with that section. There can be no quarrel with the Board's holding that plaintiff "failed to show his [sic] entitlement to an equitable adjustment under this claim." 1962 BCA at 17,082.

■ *Claim 9—"Equipment Rental"* [25] —The petition alleges damages of $11,-175.00, less $800.03 paid administratively, for the rental value of certain equipment. In the Assignment of Errors, this claim is reduced by $6,000.00 to $4,374.-97.[26] The $800.03 partial payment was for the rental of five pickup trucks for 19 days and was based on an administrative determination that the Government was responsible, in part, for delaying plaintiff by requiring the removal during excavation of certain unexpected obstructions (e. g., a sewer line and a fuel line). The contracting officer decided that, because of these unknown subsurface conditions, United retained the trucks 19 days longer than otherwise needed. Basically, this was the same delay period for which the Government admitted responsibility under claims 1 and 4, supra, and for which the contracting

---

25. This was Claim XI before the ASBCA.

26. The $6,000.00 is the rental value of a crane which the Board rejected because it had not been submitted to the con-

tracting officer. The Assignment of Errors states that plaintiff is "entitled to judgment for $4,374.97". We take this as a waiver of the additional amount stated in the petition.

officer agreed to equitable adjustments of $14,921.65 (claim 1) and $23,804.64 (claim 4). The ASBCA affirmed the allowance of $800.03, noting that "the 19 days was the total period of delay for which it was determined the Government was responsible." It denied the remainder of the amount sought. 1962 BCA at 17,083. United's Assignment of Errors specifically asserted, for the first time, that it had to hold trucks over to the next construction season because of the changed subsurface water conditions (discussed in Part II, supra). Defendant argues that the rental claim was pressed as one for delay and not as one for an equitable adjustment for changed conditions; that the Board decision is supported by substantial evidence; and that the plaintiff has not referred to any evidence demonstrating that the Board erred in its conclusion. Because we conclude that these expenses were attributable to the changed subsurface water conditions, we hold that plaintiff is entitled to recover.

The contracting officer's determination that only part of the rental expenses should be allowed depends ultimately on his finding that, while there were some unknown conditions, there were no changed water conditions. Had there been an administrative finding of changed water conditions, the entire rental sum would have had to be allowed. One of United's partners testified that the equipment rental claim was grounded on the unforeseen water conditions.[27] The partner also testified at some length on the merits of United's claim. Because the Board decision on this point rested on an erroneous premise, and there is no

evidence supporting it, it must be overturned.

■ *Claim 10—"Watertight Seal"* [28] —Plaintiff seeks $2,654.95 for the cost of installing a watertight seal around an expansion joint where the utilidor walls contacted an existing sewer. The Board accepted plaintiff's contention that watertight construction was not required, but held that "there obviously was some limitation on the nature of a joint" plaintiff could install. Because "the amount of seepage at the joint was substantial", the ASBCA held that the "Government was not ordering extra work when it required the contractor to take corrective measures to eliminate the seepage." 1962 BCA at 17,084. There is some indication in the record that the parties knew a watertight seal was required. Our trial commissioner held that the Board decision was supported by substantial evidence, and the plaintiff has not excepted to his holding. The claim is therefore denied.

■ *Conclusion:* As indicated above, plaintiff is entitled to recover on claims 1, 2, 4, and 9, and judgment is entered to that effect. Unless the parties can stipulate as to the amount of recovery under claims 1, 4, and 9,[29] further proceedings in this court are suspended to allow the parties to have the amounts of recovery under those claims determined, in the first instance, by the Armed Services Board of Contract Appeals. United States v. Anthony Grace & Sons, Inc., supra, 384 U.S. 424, 86 S.Ct. 1539. Plaintiff is not entitled to recover on claims 3, 5, 6, 7, 8, and 10, and the petition is dismissed to that extent.

27. The following colloquy, referring to the equipment rental claim, took place between plaintiff's counsel and Mr. Morris:

"Q. So it is equipment which you had to use for a longer period of time because of the changed conditions?

"A. That is correct.

"Q. And that is the basis on which you are asking it?

"A. That is correct." [tr. p. 237].

28. This was "Subsequent Claim" 3 before the ASBCA.

29. We have determined the amount under claim 2 to be $3,014.40.